**NEW ORLEANS COAL & BISSO TOWBOAT CO. et al. v. UNITED STATES et al.***

No. 8055.

Circuit Court of Appeals, Fifth Circuit.

Oct. 27, 1936.

*Rehearing denied 86 F.(2d) 1008.

54

HUTCHESON, Circuit Judge, dissenting in part.

Esmond Phelps, W. B. Spencer, W. B. Spencer, Jr., and Selim B. Lemle, all of New Orleans, La., for appellants.

Lucian Y. Ray, Sp. Atty. in Admiralty, William I. Connelly, Senior Examiner, Ins. Division, U. S. Shipping Board, Edouard F. Henriques, M. A. Grace, Edwin H. Grace, Daniel H. Grace, and Milton C. Grace, all of New Orleans, La., for appellees.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

FOSTER, Circuit Judge.

This is a case of limitation of liability in admiralty, arising from the loss of a steel barge and her cargo of levee building machinery, on December 4, 1924, while being towed in the Mississippi river, by the tug Leo. A libel was filed by the owner of the machinery, Fluker Gravel Company, and the Leo was attached. Thereafter a petition was filed by the owner of the tug, New Orleans Coal & Bisso Towboat Company, on January 5, 1925, denying liability but surrendering the tug in limitation of liability, under the provisions of the statute (46 U.S.C.A. § 183), in the event liability should be decreed. Though it does not clearly appear from the record, it may be assumed that the tug was appraised and released on bond in the sum of $20,000, with Joseph A. Bisso and the Union Indemnity Company as sureties. Limitation was opposed by the owner of the machinery, Fluker Gravel Company, on the ground that the tug was unseaworthy, and by the United States, owner of the barge, on that ground and also on the ground that the barge had been procured from the United States Engineers by fraud and misrepresentation on the part of William A. Bisso, president of the towing company, and was thereby converted to its own use by the owner of the tug, which became an insurer.

Evidence was taken before a commissioner. After a hearing before the late Judge Grubb, an interlocutory decree was entered by him on March 28, 1931, denying limitation as to the claim of the United States, on the grounds urged, and allowing it as to the claim of the gravel company.

Further evidence was taken before the commissioner as to the amount of damages. He reported, fixing the damages to the United States at $30,000 for the loss of the barge, basing his finding on the value at which she was carried on the books of the United States Engineers. He rejected a claim for replacement value and cost of an unsuccessful attempt to salvage her. The loss of the gravel company was stipulated at $40,000.

Exceptions to the commissioner's report fixing the damages were overruled by Judge Borah on December 16, 1935.

In the meantime the St. Paul Fire & Marine Insurance Company was permitted to intervene, claiming as subrogee of the United States, as insurer of the barge, in the sum of $24,476.51. The Louisiana National Bank of Baton Rouge was also permitted to intervene to assert its rights as assignee of the claim of the gravel company.

The final decree was entered on December 26, 1935, amended on January 7, 1936, against the New Orleans Coal & Bisso Towboat Company in favor of the United States in the sum of $5,523.49; in favor of the St. Paul Fire & Marine Insurance Company in the sum of $24,476.51; and in favor of the Louisiana National Bank of Baton Rouge in the sum of $40,000. Judgment was also rendered in solido against Joseph A. Bisso and the Union Indemnity Company, sureties on the stipulation for value, upon which the tug had been released, respectively in the sums of $20,000 and $23,000. The amounts were awarded with interest at either 5 or 6 per cent. from various dates.

The New Orleans Coal & Bisso Towboat Company had been placed in receivership in a state court and Joseph A. Bisso had been appointed receiver. This appeal was taken from the judgments above recited by the towboat company, through its receiver, and by Joseph A. Bisso individually. The Union Indemnity Company and its receivers were severed in taking the appeal.

Since all the evidence was taken out of court, we are not required to give effect to the presumption usually arising from the fact that the trial court saw and heard the witnesses. In considering conflicting

testimony, there is no choice between the witnesses as to their interest, as nearly all of them are officers or employees of the contesting parties. The whole case is before us, and we are at liberty to draw our own conclusions from the evidence in the record. We must of necessity review the evidence somewhat fully.

■ The circumstances attending the renting of the barge were these: A verbal contract of towage was entered into between O. O. Ogden, president of the gravel company, and Wm. A. Bisso, president of the towing company, for the hiring of a barge and tug for the transporting of certain levee building machinery, from a point near Cook's Landing, La., to a point near Ferriday, La., both on the Mississippi river, for the purpose of using the equipment in the building of a government levee. The price to be paid was fixed on a per diem and demurrage basis, in conformity with a previous contract between the parties. The machinery was not to be moved until some time later. It was contemplated that the towing company would furnish one of its barges and its tug, Patton, a light draft stern wheel boat, and the gravel company would load the machinery on the barge at its own expense. About two weeks later, when the gravel company was ready to move its equipment, Ogden telephoned from Cook's Landing to Wm. A. Bisso at New Orleans and advised him he was ready to move. Bisso replied that he was also ready. However, the next day Bisso rang up Ogden and advised him that the large barge intended to be used was not available nor was the Patton, as she was at Natchez; that he could use the tug Leo and could get a government barge to carry the equipment. Ogden demurred as to the use of the Leo but not as to securing a government barge. Bisso advised him that he would use the Leo to tow the barge to Angola near where the Patton would meet the tow and resume the voyage. Ogden agreed to this and said to Bisso, "All right, Billy. Go to it."

It is the settled policy of the United States Engineers to rent one of their barges to a levee contractor for the purpose of moving his equipment, to be used on government work, when he can not procure a suitable barge elsewhere. The contractor renting the barge is required to give security for her value or to furnish an insurance policy covering the barge. Under no circumstances would a barge be rented to any other party to be used for profit. The barge was rented through Schmidt, chief clerk in the office of the United States Engineers at New Orleans. He did not have authority himself to rent the barge and sent a telegram in the name of his chief, Major Bennion, to the president of the Mississippi River Commission, asking for authority to rent the barge to Ogden. He received a telegram in reply, addressed to Bennion, giving the necessary authority. An insurance policy covering the barge for her full value as carried on the books, $30,000, was delivered to Schmidt, and after that the barge was turned over to the Leo and was taken up the Mississippi river by her. The day after his conversation with Bisso, Ogden telephoned to Schmidt to inquire whether Bisso had secured the barge and was advised that he had. So far there is no dispute in the evidence.

As to the negotiations for the barge, Schmidt testified that Wm. A. Bisso made all the arrangements for renting the barge, delivered the insurance policy to him, and then received an order for the delivery of the barge. He did not know the Fluker Gravel Company and considered that Bisso was acting for Ogden. Bisso did nothing that would lead him to believe that he was acting for himself personally; that, if he had done so, it would have been necessary to refuse the barge.

Ogden testified that Bisso made all the arrangements for renting the barge and he had nothing to do with it and, in response to a leading question by his counsel, he said that he did not directly or indirectly at any time authorize Wm. A. Bisso to represent to any official of the United States government that he was acting for him in securing the barge.

Bisso admitted securing the insurance, paying the premium and delivering the policy. He testified that he knew he could not secure the barge for himself; that Ogden made all the arrangements for renting the barge; that Schmidt first telephoned to him about the barge, advising that Ogden had secured it; and that he had nothing to do with renting it.

There is evidence in the record tending to show the general custom as to the renting of barges by the United States Engineers to levee contractors. Ogden testified that he had used the same barge 10 or 12 times previously, in some of which movements the towing company had towed it; that he always made all the arrangements

himself with the Engineers' office by letter, paid the rent of the barge to the United States, and paid the insurance premium.

Hearin, another levee contractor, testified that for a long time it was impossible to secure barges for moving heavy levee equipment from any one except the United States; that he frequently had rented them, usually by a personal application, but on one occasion when Bisso was doing the towing Bisso had made all the arrangements as to securing a barge for him, had taken out the insurance, paid the premium, and had charged the premium to him. Hardin, president of Marshall J. Smith & Co., the agents who issued the policy, testified that according to his records his agency had insured the same barge a number of times, on two of which occasions Bisso had arranged for the insurance and paid the premiums; and that the policies, in the usual course of business, were delivered direct to Schmidt.

In resolving the conflict in the testimony of Ogden, Schmidt, and Bisso, it is not necessary to hold that any of them was guilty of intentional false swearing. The evidence was taken some two years after the occurrence. It is apparent that the renting of a barge from the government by a levee contractor is an ordinary business transaction, of frequent occurrence, that may be conducted verbally and without formality. Ogden's testimony does not go to the extent of showing that Bisso told him he could get the barge for his own account. Both Bisso and Ogden knew that Bisso could not get it for his own account and knew he could get it for the account of the gravel company. If he wanted to keep out of the transaction entirely, why did Ogden telephone to Schmidt to find out whether Bisso had gotten the barge, rather than telephone to Bisso. Bisso was in New Orleans and so was Schmidt. Ogden was at least 100 miles away. It may be presumed Ogden wanted to save the delay that would necessarily have ensued if he had pursued his usual practice of applying for a barge by letter. There could have been no possible objection to his authorizing Bisso to act for him. Bisso may well have assumed that Ogden would take some steps to rent the barge. Schmidt could not rent the barge until he received authority from his superior officer. When he received that authority, it was necessary to notify Bisso in some way and it would be perfectly natural for Schmidt to telephone Bisso to advise him that the barge was available. At the time of the transaction the parties were friendly and had confidence in each other. It is the intention of the parties that must govern. The United States intended to rent the barge to Ogden. It was immaterial whether this was accomplished through Bisso as Ogden's agent. There was no need for Ogden and Bisso to go into details in their telephone conversation. Both knew what could be done and what could not be done about getting the barge. The conclusion is inescapable that when Ogden told Bisso to "go to it" he intended that Bisso should act for him and tacitly authorized him to do so. By receiving and using the barge, knowing the only condition upon which it could be so used, Ogden ratified the agency of Bisso in securing it. What the parties could have done, and intended to do, was done. We conclude that there was no fraud or deceit practised upon the United States and the towing company was not guilty of converting the barge to its own use so as to make it an insurer.

There is conflict in the testimony such as usually occurs in cases of this kind, but the following facts are shown with reasonable certainty. For brevity, we will refer to the towing company as petitioner and the United States and the gravel company as claimants.

The Leo was a small tug, about 89 feet in length and of about 500-horse power, amply able to tow the barge. She was fitted with a number of steam siphons and a large pump on deck, all in good order. She had been overhauled and put in thorough repair not long before the trip. She was inspected and passed by the local United States inspectors at New Orleans on August 18, 1924, shortly before the voyage. Her certificate of inspection permitted her to operate with one licensed second class pilot, one deck hand, one licensed chief engineer, and one fireman, when not working more than 13 hours out of 24 in any one day. Her officers and crew had been instructed by her owner not to violate the 13-hour law and the certificate of inspection was posted in the pilot house. On this voyage her crew consisted of Cochrane, her regular captain, licensed as a pilot to run from New Orleans to Baton Rouge; Wills, licensed as a first-class pilot to operate from New Orleans to Vicksburg; a licensed engineer; an oiler, competent to handle the engines in answer to the bells from the pilot house, if necessary; two

firemen; and two deck hands. Her steering gear was in good order and she had the lines necessary to safely tow the barge.

The barge was about 124 feet in length by about 40 feet in width, square on one end, with a rake at the other. She was approximately 14 years old, built of steel, with a bulkhead running lengthwise and four crosswise, forming eight compartments. There was no evidence to show that these compartments were watertight. She was equipped with siphons for each compartment to be operated by steam. She had no means of making steam or of self-propulsion. There were about 18 or 20 hatches opening into the hold from the deck. There was a coaming around the deck about 15 inches high, with the necessary scuppers to allow water falling on her deck to run off. She was designed to carry levee building machinery for the United States and had four tracks, which fitted the gauge of wheels on government machines. When loaded, she drew about 4 to 4½ feet, leaving a freeboard of 12 to 18 inches.

The Leo took the barge from the government yard at New Orleans on the morning of December 3, 1924, and towed her up the river to Cook's Landing, where she arrived late in the afternoon. After delivering the barge, the tug moved off about 200 feet and tied up to the bank. Three or four times during the night the tug went to the landing to give water to the engine of the levee machine. The loading of the machine, a dragline dredge, equipped with a long boom and a bucket, was done that night by a crew of men regularly employed by the gravel company, under the personal direction of Ogden, its president, and Cantey, its superintendent. Cantey and a number of these men accompanied the barge on the voyage. The levee machine had dug out a shelf to allow the head of the barge to go close to the bank. The wheels of the levee machine did not fit the tracks on the barge. One of the tracks on the barge was taken up, a quantity of river sand was placed on the head of the barge by the machine to facilitate getting it over the coaming, and then was smoothed by hand, to cover the tracks on the barge, and supply a foundation for the levee machine. Sections of tracks to fit the levee machine were constructed on cross-ties and stringers. Boards were put on top of the dirt on the barge. The sections of track were then laid on top of these and the levee machine was loaded on them on the barge under its

own power. The crew of the tug had nothing to do with the loading. The levee machine, weighing 175 to 180 tons, was secured to the temporary track, but this was not fastened to the rails on the barge. When loaded on the barge, the boom of the machine, which weighed about 9 tons, extended out in front for perhaps 50 or 60 feet. Other equipment loaded on the barge was intended to counterbalance the boom.

A quantity of coal had been put on the stern of the barge before leaving New Orleans by the towing company. There was no objection to this by claimants. The exact amount was not shown, but a reasonable estimate from the evidence would be that there were between 25 and 30 tons. The undisputed evidence was that this coal was intended for the Patton. However, in the course of going up the river, some of this coal was used by the Leo. Estimates as to the amount vary, the crew of the tug testifying that no more than two tons were used. This would seem reasonable, as the undisputed testimony of the engineer of the Leo was that her coal consumption was about 5 tons per 24 hours. The Leo had ample coal on board for the voyage, in her bunkers and on deck, and there was no necessity to use the coal from the barge. After the loading was completed, the barge was pulled out in the river. Ogden and Wills thought she was sitting level and was safe to tow. The barge was made fast to the starboard side of the Leo, the stern of the tug extending beyond the stern of the barge, which was necessary in order to steer properly. The tow left Cook's Landing about 7 o'clock in the morning. There was a light but steady rain all day. The testimony of those on the barge tends to show that it was dry under the machine but the sides of the deck were muddy and slippery. The tow proceeded at about 3½ to 4 miles an hour, reaching Angola about 7:30 p. m., where it was moored at the railroad transfer slip and remained about 30 minutes, while Cochrane went to send a telegram to Bisso.

While at Angola, steam from the tug was connected up with the siphons on the barge to pump her out. After operating a while, the siphons blew steam, which indicated there was no more water in the barge at that time. The tow left Angola about 8 p. m., and some 30 minutes thereafter the levee machine suddenly shifted and went over the front right-hand corner of the barge. This carried the head of the

barge down under the water. She filled up and practically stood on end. The towing lines connecting her with the tug had to be cut in order to save the tug. The barge then floated around, practically stern up. After cutting loose, the tug unsuccessfully tried to beach the barge and then went up the river a short distance to a government boat, called the Ram, and there borrowed 400 feet of line, about 1¼ or 1½ inches in diameter, and returned to the scene of the disaster, but the barge had sunk and disappeared. The undisputed testimony is to the effect that it was the intention to use this line to fasten the barge to a tree on the bank, or to anchor a buoy to indicate her position, to facilitate later salvage operations.

At the time of the disaster Wills was at the wheel of the Leo. His testimony was that the accident occurred in the middle of the river, in 45 to 60 feet of water; that after the tug was cut loose from the barge he put a towline on the barge and tried to beach her but was unable to do so. A number of witnesses for petitioner, including Wills, testified that immediately preceding the shifting of the levee machine a distinct jar was felt, indicating to them that the barge had struck an obstruction of some kind. Wills, a licensed pilot of long experience, testified that large trees are frequently precipitated into the river by caving banks and float practically submerged. The witnesses for the claimants testified they felt no jar.

Cantey, who had been with the gravel company for 14 years and had been engaged in loading and moving levee machinery on barges for that length of time, testified that when the tow was about 6 miles below Angola the wind was blowing hard, the waves were jumping, and the barge was down by the head. He attributed this to water coming in through the scuppers and running into the hold. Steps were taken to stop this and succeeded. He spoke to Wills about it and suggested that it would be advisable to land the barge. Wills told him he knew when and where to land and Cantey thought it did not matter much, as the barge was steel and strong.

There was testimony tending to show that the reach below Angola was the most dangerous part of the voyage. The water was shallow, not over 12 feet deep, and the current was swifter than above Angola where the river was deep.

Claimants contend that the tug was unseaworthy for the following reasons: (1) Because she was not equipped with a proper line with which she could have been secured and saved the barge after it was upset; (2) that she had insufficient bunker capacity and this contributed to the loss, because using the coal piled on the barge altered the trim of the barge and caused the dumping of the levee machine and the upsetting of the barge; (3) that the tug was placed in charge of two masters without instructions from the owner as to their respective duties, resulting in conflict of authority; (4) that the tug was undermanned and a single crew was required to carry out a fixed schedule by the owner, which resulted in the crew being overworked, in violation of the 13-hour law; (5) that the tug had no designated member of her crew to act as lookout.

The law is well settled. There was an implied warranty of seaworthiness under the oral contract. Seaworthiness is a relative term. A vessel may be seaworthy for one purpose and not for another. If a vessel becomes unseaworthy after she breaks ground, without the knowledge and privity of her owners, that does not prevent limitation of liability. Cullen Fuel Co., Inc., v. W. E. Hedger, Inc., 290 U.S. 82–89, 54 S.Ct. 10, 11, 78 L.Ed. 189; The 84-H (C.C.A.) 296 F. 427; The George W. Pratt (C.C.A.) 76 F.(2d) 902.

The District Court did not pass upon any of the allegations of unseaworthiness except the first. As to this, he found that the tug was not equipped with a necessary line to be used in an effort to save the barge, and she was therefore unseaworthy as regards the barge with the knowledge and privity of her owners.

A tug is required to be properly equipped for the purpose of her engagement. She must make reasonable efforts to recover the tow if it has broken away from her, but she owes no duty to the tow after it has sunk. Cf. Olympic Salt Water Co. v. Shipowners' & Merchants' Tugboat Co. (C.C.A.) 48 F.(2d) 49. A tug is not required to be equipped with appliances to salvage the tow or to meet emergencies not reasonably to be anticipated in the course of the voyage. A long, light line was not necessary to tow the barge made fast alongside. There is no doubt whatever that the tug had the necessary towing lines in good order. The evidence of Wills tends to show

that, after the tug was cut loose from the barge for her own safety, she went back to the barge, which was floating practically end up, and attached a towline to her and attempted to beach her but was unsuccessful. If this testimony is entirely disregarded, the physical facts show conclusively that it would have been impossible to beach the barge at that time. We do not consider the tug was unseaworthy because of not having such a line as she procured from the Ram.

There is no doubt that the tug had sufficient coal on board for the voyage. The removal of the small quantity of coal from the barge could not have rendered the barge unseaworthy.

■ The evidence is clear that there was no conflict of authority between Wills and Cochrane. In testifying, at times each referred to the other as master of the tug, but that is all to support the contention of claimants. Cochrane was the regular master of the tug, but, not being licensed as a pilot above Baton Rouge, where the towing began, Wills, who was licensed as a pilot from New Orleans to Vicksburg, covering the intended voyage, was actively in command and Cochrane was performing the duties assigned to a mate. Naturally, when the accident occurred, both gave orders, but that would not be inconsistent with the duties of a mate and a master in their respective spheres.

■ The tug was not undermanned. She had more crew than her certificate of inspection required. So far as the evidence goes, it is certain that they were experienced tugboat men and in their respective capacities were competent. If they elected to disregard their instructions and worked overtime, it cannot be said that was with the knowledge and privity of the owner. But it is plain that if there was a violation it was negligible. It is argued on this point that the crew was actively employed for approximately 36 hours, first in towing the barge from New Orleans to Cook's Landing, then standing by all night while the levee machine was being loaded, for the purpose of furnishing water to her boilers, and then on the voyage to above Angola where the accident occurred. This theory is wholly untenable. The three or four times during the night the tug moved up to the barge to furnish water would not have occupied more than a few minutes each time. Every one on the tug had ample opportunity for rest and sleep. The time the tug left Cook's Landing with the tow, when she arrived at Angola, and when the accident occurred, is not fixed with certainty. If it be assumed that the voyage started at 7 o'clock in the morning and the accident occurred at 8:30 that night, without deducting some 30 minutes spent at Angola, that would amount to only 13½ hours. Since the entire crew was awake and able to render services when the accident happened, it is certain that the slight overtime that may have been put in by the crew was negligible and in no way contributed to the accident.

■ It is not the duty of the owners to designate a certain member of a vessel's crew to act as a lookout. That is the duty of the master, usually delegated to the chief officer. Considering the theory of claimants as to the cause of the accident, the absence of a lookout could not possibly have contributed to it, but the evidence is undisputed that Cochrane was on the head of the barge immediately preceding the accident. He could have performed all the duties of a lookout and, if he did not, that was not with knowledge and privity of the owner.

We consider that petitioner has fully sustained the burden of showing that the tug was seaworthy for the purpose of the voyage.

The District Court found that the barge was seaworthy; that she was properly loaded to the satisfaction of the officers of the Leo; that in proceeding up the river water was taken aboard the barge and by the time the tow reached Angola, due to the water in her, the barge was down at the head; that she sank, not as the result of having struck any obstacle in the river, but as the result of being down at the head with water, caused by the negligent failure of the officers and crew of the tug to pump the barge out and the reckless navigation of those in charge of the tug; and that the presence of the levee machine and its equipment on the barge and the manner in which it was loaded thereon in no wise contributed to the loss.

■ A tug is bound to use only reasonable and ordinary care and skill in conducting the tow, and is neither a bailee nor an insurer of the tow. The owner of the tug is not responsible for proper stowage of cargo on the tow nor for an honest error of judgment on the part of the tug's master. A suit to recover damages for loss of the tow is an action ex delicto and the burden is on the claimants to prove the

negligence of the tug. A presumption of negligence does not arise merely from a showing that the tow has been damaged. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; The Ashwaubemie (C.C.A.) 3 F.(2d) 782.

It is undisputed that steam from the tug was connected to the siphons on the barge, with the intention of pumping out any water that might be in her. It is also certain that the siphons blew steam. The preponderance of the testimony is that this indicated that all the water in the barge had been removed. Witnesses for claimants did not deny this, but testified that the blowing of steam from the siphons might also indicate that they were not in good working order. It is also undisputed that before the barge left Angola Cochrane made an examination of the hold of the barge, using a lantern to do so. He testified that he was satisfied there was no appreciable amount of water in the hold, although there was a little, not over 3 inches; that this could not be removed by pumping, as the pumps would not draw in that depth of water; that no barge is ever entirely watertight; that a little water in the hold is to be expected under any conditions and is immaterial.

The preponderance of the testimony tends to show that the barge was actually pumped out before leaving Angola, but, aside from that, in the exercise of reasonable care, the officers of the tug were entitled to assume that siphons on a barge owned by the United States were in good working condition, as indicated by their blowing steam, and they were not required to make a more critical examination.

The tug was not liable for any nonapparent unseaworthiness of the barge. When the siphons blew steam, that was sufficient to warrant the officers of the tug in believing that the barge had been fully pumped out. It was not the absolute duty of the tug to pump the barge dry. The duty was to use ordinary and reasonable care and skill to do so. The testimony on this point of all the witnesses for petitioner is that in leaving Angola the barge was sitting level. The testimony of the witnesses for claimants is somewhat in conflict. Cantey said she was still down by the head. One witness said she was level at Angola because resting on the bank. Others said the siphons were not used until after leaving Angola. On all the evidence, we consider that claimants have failed to sustain the burden of proving that the officers and crew of the tug were negligent in failing to use reasonable care and skill to pump out the barge.

It is not shown that after leaving Angola the navigation of the barge was negligent or reckless. The speed of the tow was not excessive. It had safely passed through the most dangerous part of the voyage, which was below Angola, at about the same speed. The rain had stopped, and there were no unusual conditions of wind or current. The accident occurred in deep water. It is undisputed that the night was clear, not very dark, and visibility was good. The burden of proving negligent navigation has not been sustained.

The burden was not on the tug to prove how the accident happened. However, the positive testimony of the witnesses for petitioner, tending to show that the barge struck some submerged object, may not be arbitrarily disregarded simply because of the negative testimony of the witnesses for claimants that they felt no jar. Wills' testimony that large trees are frequently cut away from the banks by the action of the river and float practically submerged is undisputed. It is well settled that floating drift in the Mississippi river is considered a "peril of the river" covered by ordinary policies of marine insurance. See Thomas v. Manheim Ins. Co., No. 14,-293, U. S. District Court, Eastern District of Louisiana, unreported, affirmed Mannheim Ins. Co. v. Thomas (C.C.A.) 213 F. 1021.

It is a reasonable hypothesis that the accident might have occurred through the barge striking a piece of drift, which either caused her to leak or caused the heavy levee machine to start slipping. In considering this, it must be remembered that one of the permanent rails of the barge had been removed and such weight as would have rested on that rail had no more solid foundation than the river sand. The structure on which the machine rested was not secured to the deck of the barge in any way. It could have been better secured by lines around it made fast to the bits of the barge. There must have been some motion of the barge in the course of the voyage, even in the Mississippi river. The motion of the barge might have caused the machine to loosen on its foundation, as the dirt on which it rested had been converted into mud by a constant all day rain, at least on the edges. On this slippery foundation

a slight jar might have been all that was necessary to cause the machine to slip until the extended boom overbalanced the barge. The tug was not responsible for the loading of the machine.

The only fact proven with certainty is that the barge sank and the levee machine was lost because the machine shifted and went overboard causing the head of the barge to go under. What made the machine shift is left in the realm of conjecture.

The case turns on the burden of proof. There is no choice in determining the credibility of the witnesses but the probabilities are with petitioner. It is not probable that the experienced master of the tug would have proceeded with the barge if it was obvious she was in an unseaworthy condition. It is highly probable that Cantey would have again protested as to the condition of the barge on leaving Angola if he thought it unsafe, as he did below Angola. It is reasonable to suppose that every one having experience in such matters thought it safe to continue the voyage.

On the whole case, we conclude that the burden of proving the tug was seaworthy has been sustained by petitioner and that the burden of proving the accident occurred through the negligence of petitioner has not been sustained by claimants. Stevens v. The White City, supra; Dameron-White Co. v. Angola Transfer Co. (C.C.A.) 19 F.(2d) 12.

The judgments appealed from are reversed, and the case is remanded for further proceedings not inconsistent with this opinion.

Reversed and remanded.

HUTCHESON, Circuit Judge (concurring in part and dissenting in part).

I disagree with the District Judge and I agree with the majority on the issues of conversion and unseaworthiness. I agree with the District Judge and disagree with the majority on the issue of negligent navigation. I therefore concur in reversing the decree for denying limitation and dissent from reversing it for its finding of negligent navigation. I have no quarrel with any of the general legal positions the majority opinion takes. I agree with them all. My difference arises entirely on the facts. The majority holds that the testimony is insufficient to establish negligence. The District Judge thought it sufficient. I think so. Indeed, I think that the record as a whole permits of only one reasonable conclusion. That conclusion is that when the barge left Angola she was dangerously down by the head and that in her condition, which was known to the tug captains, it was negligence to navigate her as she was afterwards navigated in beating up and across the river to find a landing. The testimony of the witnesses for the Fluker Gravel Company furnishes abundant support for this conclusion. The only counter testimony is the afterexplanation by supposition of those on the tug that the barge may have struck a submerged object. I believe the former credible, the latter incredible. It is true that the tug was not an insurer of the barge and owed it only the duty of ordinary care. It is true, too, that the burden of proving negligence was on the tow and that such proof wanting the tug could not be held liable. But, as I read the record, this is not a case of failure of proof. There is, I think, positive and abundant testimony of the unseaworthiness of the tow when she left Angola and that those in charge of the tug knew of that condition. I believe that testimony to be reasonable and true.

I think the explanation of the sinking those on the tug put forward is an afterthought devised to shield themselves from blame and their owners from responsibility for a piece of negligent navigation. The difference between me and my associates is not on matters of law but on the truth and effect of testimony. It will therefore serve no useful purpose for me to extend this dissent with excerpts from the record. It will suffice to say that I think that on the issue of negligent navigation not my associates but the District Judge and I have read the record aright.