## THE LAPWING.

### No. 457.

District Court, E. D. Louisiana,
New Orleans Division.

Aug. 22, 1944.

Terriberry, Young, Rault & Carroll and Benjamin W. Yancey, all of New Orleans, La., for plaintiff.

Chaffe, McCall, Bruns, Toler & Phillips and James Henry Bruns, all of New Orleans, La., for defendant.

CAILLOUET, District Judge.

Libelant seeks recovery for damages sustained by its quarters boat "Santee" while tied up for the night at Carrabelle, Florida, on November 22, 1939, as part of the tow of the libeled tug, the "Lapwing."

The arrangements made for such towing are reflected by libelant's letter addressed to Shell Producers Company and its answer thereto by its President, F. M. Hendry, who appears as record claimant of the tug; although such arrangements were subsequently slightly modified in presently unimportant details by telephone conversations between Hendry and the representative of libelant, while actual performance of the towing was in progress.

The parties contemplated that there should be towed from Slidell, La., to Charleston, S. C., libelant's fully described dredging equipment, to which was to be added on the way, at Pascagoula, Miss., libelant's said quarters boat "Santee"; and that the dredge "Illinois" and the "Santee" were, each, to be towed separately, in the outside waters, or the Gulf of Mexico proper, from Carrabelle to Fort Meyers, Florida, from which point to Charleston, S. C., the towing of libelant's equipment was to be continued no longer by the "Lapwing" but by the "General Pershing", and the "Falcon", assisting, if required.

Accordingly, the "Lapwing" took the "Santee" in tow at Pascagoula. The quarters boat was last in line, with the dredge "Illinois" in the lead, and the barge "A.G.T. 146" astern thereof and just ahead of the "Santee".

The tug and its tow entered Carrabelle Harbor at night and at some time before midnight was completely berthed on the east bank of Carrabelle River in the one then available mooring-place considered safe by the master of the tug.

Carrabelle Harbor is described by F. M. Hendry aforesaid, who claims to know it very well, as not a good harbor but one which, because of its geographical location, is made use of at times for lack of a better.

Captain Tindall of the "Lapwing" had been in the harbor before and the berth which he selected for tying up the "Lapwing" and her tow was known to him inasmuch as not only had he theretofore made similar use of said berth but he had seen, as he also testified, other marine equipment moored in the selfsame place. He, himself, had never made use of any other mooring-place and while he knew of barges having gone aground there, no damage had ever resulted to any of the equipment of Shell Producers Company, nor to any other

within his knowledge. In this connection, it may be noted here, that the log book of the "Lapwing" records the fact that the tug pulled a barge off of a Carrabelle Harbor bank on June 16, 1939, and that, upon his being interrogated about the occurrence, Captain Tindall testified that the bank in question was exactly where he berthed his tow on the night of November 22, 1939, and that there was no hanging up of the barge amidst submerged piling but a simple resting on the bottom. Such going aground was to be expected, he further said, unless moored vessels were released from their ties to the bank and were progressively pulled away therefrom in keeping with the falling of the tide.

The engineer on the "Lapwing," also, was familiar with conditions in Carrabelle Harbor in 1939 and he had seen barges and the dredge "St. Louis" of Shell Producers Company tied up at the same point where the "Lapwing" and its tow were berthed by Captain Tindall on that November night.

Seburn Jackson, a lifelong resident of Carrabelle, 37 years of age, who had engaged in boating "mostly out of Carrabelle" for twenty years and who was harbor master of Carrabelle port from 1937 to 1940, by official State appointment (although the position, he frankly admitted, was of no great importance), testified that he was well acquainted with the particular berth where accident befell the "Santee", having seen "tugs of all kinds" tied there during the ten years next immediately preceding that occurrence, and he, himself, having moored both steel and wooden barges there, some loaded with paper-wood, some with lumber, some with oil, and never did ill results follow; nor did he ever know of any other craft being sunk or getting into trouble because of its having tied up exactly where the "Lapwing" and its tow did on the night of November 22, 1939.

Two other lifelong residents (Kilbourn and Putnal), of approximately the same age as the Harbor Master Jackson, both testified that they had always known the berth in question to be a safe mooring-place, having seen crafts of all kinds tied there before the "Santee" was damaged; and neither recalled ever having heard of any such craft experiencing trouble in said berth.

The witness Mattair, resident of Carrabelle since 1887, once operated a fish business establishment, until 1936, located at very little distance upstream from the mooring-place of the "Lapwing" and her

tow; and had been Pilot Commissioner at Carrabelle for 24 years, Mayor of the town for 14 years, up to about 1916, and Acting Mayor and President of the Council for many years before becoming Mayor. He testified that he was familiar, for years, with the berth in question and knew it to have been uninterruptedly used as such by seagoing barges and flatbottom boats, but the water wasn't deep enough for use of the berth by deep-draft boats, he added.

The parties stipulated that if one C. W. Gander were testifying (on August 3, 1943) he would swear that for approximately 4½ years next immediately preceding said mentioned date, he was employed by the Gulf Oil Company at its bulk plant which was located on the East bank of the Carrabelle River, approximately 300 feet north or upstream from the point where the "Santee" was berthed and sunk on the night of November 22, 1939; that during and before said term of employment, he saw numerous barges and boats, as large as the "Santee", berthed or tied up where the accident occurred and never saw, or heard of, any one of such other barges or boats having any trouble whatever, although this may have occurred without his knowing it; and that, because he paid no great deal of attention to the site in question, he knew not whether there remained any pilings from the former discarded railroad dock that once stood there.

The five persons so testifying were disinterested witnesses, undoubtedly.

It is true that subsequent developments during the night of November 22, 1939, convincingly demonstrated that, though unknown to the masters and crews, respectively, of both tug and tow, the "Santee", with the falling of the tide had become perched upon the tallest one of a hidden nest of submerged old piling stubs of different lengths, which pierced her bottom when the "Lapwing" made an unsuccessful effort to pull the listing vessel from what all believed to be merely the settling on a mud flat.

It is also true that members of the tow's crew testified that, upon their inspection of the mooring-site at low tide and in the sunlight, they did plainly see the submerged obstructions; and that the marine surveyor who supervised the raising of the "Santee", and a diver engaged therein, testified to the same effect, whilst two employees of the United States Engineer Corps, thoroughly familiar with the locality because of their

having often viewed it in line of duty, did substantially testify that ever since 1934 the submerged piling were "obvious at low tide." One of the two, Colvin, towboat operator for the Engineers and nine years in service, said that he would not want to tie up one of the government barges where the "Santee" was moored because, said he, "there is piling all through there from the old wharf, the old piling are off down below the water that you could not see. And some others that you could see, they were right up close to the edge. In low water you could see them well, but when there is high water they are covered up pretty well." Associate Engineer Campbell (formerly known as "Surveyor" only), the other one of said two employees, of 11 years standing, was of the opinion, however, that it was safe to berth a tow of flat-bottomed oil barges within an estimated shore extent of 1000 feet South or downstream from the Gulf Oil Company dock; not so, for other types of vessel, said he, because they would be "hung up if the tide drops"; and the tide does fluctuate at Carrabelle 1½ feet every 24 hours—sometimes as much as 3 feet—he continued.

In this connection, it may be noted that, according to his apparently credible testimony which is undisputed, Captain Tindall, master of the "Lapwing" was under the impression that the "normal" tide was about 3 feet, and at the time of tying up tug and tow on the East bank of Carrabelle River a short distance South or downstream from the small T dock of the Gulf Oil Company, he took soundings inshore to make certain of "safe draft," as he termed it; and found 9 to 12 feet of water—11 or 12 feet—with the tide then running "about a half tide".

The draft of the "Lapwing," he testified, was 8½ feet. This was considerably more than the draft of either of the three vessels in tow, and the last astern, which was the "Santee", drew no more than 16 inches, according to the uncontradicted testimony of libelant's employee, Blount, who with four co-employees rode the tow and were in full charge and custody of the same, except to the extent that it was necessary for the "Lapwing", as towing vessel, to be in control in order to fulfill the towing contract and to govern the movement of the flotilla. Stevens v. The White City, 1932, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699.

J. G. Hoskins, one of libelant's said representatives, captain of the dredge "Illinois" and in full authority over the crew of the tow, testified as to what took place later in the night of the accident, substantially as follows, viz.:

After returning aboard from a trip ashore, to procure groceries for the contemplated tow of the "Santee" alone to Fort Meyers on the next day, he was informed that the "Santee" was listing offshore; the list was "maybe about six inches"; he ordered the captain of the "Lapwing" called, saying the "Santee" was aground and that the tug should pull her off; the "Lapwing" accordingly responded and pulled the "Santee" from one end; it merely swung around; he, Hoskins, then directed the tug to catch the other end but, this done, nothing but a similar pivoting effect resulted; he then made an investigation which revealed that the "Santee," for the first time, was taking water, having just had its bottom pierced by a pile; had he thought, at first, that the "Santee" was resting on such pile and not on the ground, he doesn't think he would have moved the vessel "because it is dangerous when you go to pulling them around"; he is sure that "when they pulled on it they started to punch a hole in it"; and that the crew of the "Lapwing," as well as that of the tow, did everything they could, but without avail, to prevent the "Santee" from sinking, as, however, finally did take place, partially.

Since the sole issue in the case is negligence vel non on the part of the tug and the Court is of the opinion that libelant has failed to successfully carry the burden resting upon it to show negligence, the following are made the Court's formal findings of fact and conclusions of law (without resort first had to Admiralty Rule 12, of the rules of this Court), viz.:

### Findings of Fact

1. On November 22 and 23, 1939, as well as before and after said dates, there existed a valid contract of towage between libelant and Shell Producers Company covering towage by said company's tug "Lapwing" of libelant's certain marine dredging equipment, including its certain quarters boat "Santee."

2. Because of his previously acquired reasonable amount of knowledge and experience relating to available mooring-sites in Carrabelle Harbor, Captain Tindall, master of the "Lapwing," was justified in selecting as the only one then available safe

berth for the tying up of his tug and tow during the night of November 22, 1939, the mooring-place where the "Santee" subsequently met with injury; under the circumstances, he could not reasonably have foreseen that any such injury was likely to befall the "Santee".

3. Considering his said previously acquired knowledge and experience with particular reference to the well-known usual mooring-site for visiting vessels to Carrabelle Harbor, which lay immediately South of, or downstream from, the Gulf Oil Company dock on the East bank of Carrabelle River, in connection with the soundings that he prudently made on the said night of November 22, 1939, in order to assure himself at that "present" moment that it was entirely safe to tie up in the berth that he did, Captain Tindall not only did not know, but he had no reason to know, that the continued falling of the tide down to its lowest ebb might produce a situation of danger for the light-draft "Santee."

4. Nor did Captain Tindall know or have reason to know that at lowest tide the "Santee" would rest on a nest of submerged pile butts, rather than on a mud bank, as might otherwise be reasonably expected, and that in such attempted not-unusual pulling off as might be found necessary, the drawing of the tug towards deeper water would have the effect of causing the tallest butt to pierce the bottom of the "Santee" and thereby bring about its sinking, partially.

5. The tug "Lapwing" exercised reasonable or ordinary care, caution, and maritime skill in its own management and in the handling of its tow from the moment of tying up tug and tow for the night in Carrabelle Harbor, on November 22, 1939, until due regard for its own safety compelled cessation of its efforts to prevent the sinking of the injured "Santee", partially, during the early morning hours of the succeeding day.

### Conclusions of Law

1. The tug "Lapwing" was no insurer of the safety of the "Santee," forming part of its tow, nor did there rest upon the tug the obligations of a common carrier; the presumption is that the tug's master exercised such care in her management and with reference to the tow in charge, as men of ordinary prudence and caution would exercise under similar circumstances; and if he did not, then it was the libelant's burden to prove the fact by a preponderance of the evidence. Parrot v. Wells, Fargo & Co., 1872, 15 Wall. 524, 538, 82 U.S. 524, 538, 21 L.Ed. 206, 212.

2. Having failed to so discharge the burden of proving negligence in the "Lapwing," libelant may not legally recover the damages claimed, and its libel should be dismissed, with costs.

Accordingly, let the appropriate decree, drawn in consonance with the foregoing, be duly presented for signing.