**HALLIBURTON OIL WELL CEMENT-ING CO., Libelant,**

v.

**STELLMAN TRANSPORTATION CO., Respondent.**

No. 116.

United States District Court
S. D. Texas, Corpus Christi Division.

April 23, 1954.

Act of May 23, 1934, 48 Stat. 796.
Act of July 3, 1941, 55 Stat. 577.

30. Act of August 7, 1947, 61 Stat. 913, 30 U.S.C.A. § 351 et seq.

Fischer, Wood, Burney & Nesbitt, Corpus Christi, Tex., Cox, Wagner, Adams & Wilson, Brownsville, Tex., for libelant.

Kleberg, Nobley, Lockett & Weil, Corpus Christi, Tex., for respondent.

ALLRED, District Judge.

Proceeding for damages to libelant's Barge 403 which capsized while being towed by the tug Maco Stewart, owned and operated by respondent. After offering evidence designed to show that the barge was seaworthy when it was delivered to the Maco Stewart and thereafter capsized while under the exclusive custody and control of the tug, libelant rested on the theory that prima facie negligence had been shown, thus shifting the burden to the tug to prove its suitability for the task and that its services were performed with care. Respondent thereupon moved for judgment which the court granted from the bench. Libelant has moved the court to reconsider the ruling. This I have done.

Most of the facts were stipulated and incorporated in a pretrial order. It is not necessary therefore to set out here various details as to the size of the barge, tug, etc.

Libelant constructed Barge 403 in 1950 for the purpose of rendering oil well cementing services to oil companies engaged in drilling oil and gas wells in coastal waters. The barge was an undocumented, flat-decked, square-ended, steel-hulled cargo barge, 110 feet in length by 26 feet in width, with a depth of 6 feet from the top of the main deck to the bottom. It was flat-bottomed, without skegs, and was raked at each end. Two circular cement tanks about 15 feet high and 15½ feet in diameter were mounted on the deck together with two water tanks, a deck house, mixing tanks, conveyor, hoppers, pumps and various other machinery and equipment.

The barge was purchased by libelant from Higgins, Inc. as a bare barge. The tanks and equipment were designed and placed upon it by libelant. The original design and plans were approved, with some modifications, by Higgins' engineers. According to the engineering calculations at that time, the weights of equipment and a full 5,000 sacks of cement (480,000 lbs.) would push the barge down to a draft of 4.1 feet with a free board of 1 feet 11 inches. Higgins' engineer checked these calculations and approved the barge for these weights and draft. However, as stated, Halliburton did not equip the barge exactly according to the plan approved by Higgins' engineers. Some equipment was taken off, some added and the location of some changed.

The barge was used successfully many times in the servicing of oil wells from Feb. 27, 1951 to the date it capsized on Nov. 19, 1951. On that date libelant loaded it with cement, water, and other materials, to service a well being drilled by Shell Oil Co. in Corpus Christi Bay and thereafter on such other wells as libelant might be called upon to service. It was loaded and prepared in its customary manner under the direction of one Cowan, libelant's employee, who turned it over to the crew of the Maco Stewart with the representation that it was ready for the intended voyage. The barge usually had a slight port list when fully loaded, but on this occasion she had a freeboard of only 10 to 14 inches on the port bow and 12 to 16 inches on the starboard. She was level on the port stern, high on the starboard stern. All this indicates to my mind substantially additional weight not taken into consid-

eration in the plans approved by Higgins.

The Maco Stewart had towed Barge 403 on many occasions prior to November 19, 1951. The same master and mate had been on the Maco Stewart on several of these prior occasions. The barge was taken in tow by the Maco Stewart at the Corpus Christi barge dock at about 4:00 p. m. on November 19th. At that time the tug was manned, by respondent's employees and no employee or representative of libelant was on either the tug or the barge. The Maco Stewart was also towing a steel water barge at the time.

The tug with her tow cleared the breakwater about 4:10 p. m.; and about 4:40 p. m the barge capsized just south of the cut bank of the deep water channel. Its location, just after it capsized, was given by the Army engineers as approximately 3,000 feet east of channel light 79 and approximately 270 feet south of the channel center line. It was located at this point on the following morning, bottom side up, with 2 to 4 feet of the barge sticking above the water, with its tanks on the bottom holding the barge in place. The water at this point was about 12 feet deep.

The Corpus Christi Channel at the point in question was 250 feet at 32 foot depth. The width of the channel at the top of the dredged cut varied because of a side slope from the bottom of the 32 foot cut to the bottom of the bay which was 12 feet or more in depth in that immediate area.

As the barge was outfitted on November 19, 1951, if it had a full 5,000 sack-loads of cement, it should have had a draft of 4 ft. 3 in. and a freeboard of 21 inches. When so loaded, it would take an additional load of 14,720 pounds to push the barge down in the water each additional inch. On the occasion in question, however, it had a cargo of only 403,000 lbs. of cement and 7,900 lbs. of gel, a total cargo of approximately 410,900 lbs. In view of the fact that its freeboard on the port bow was from 10 to 14 inches and from 12 to 16 inches on the starboard, and slightly off on the stern (an average freeboard of from 11 to 15 inches), the added weight, necessary to push the barge down where it was, was considerable. This additional weight was not accounted for by libelant.

Libelant offered no testimony as to any negligent act on the part of the tug or its crew. Libelant simply insists that the evidence shows that the barge was seaworthy when delivered, that it was under the exclusive control of the tug, that it capsized, which was an unusual event, and that, therefore, there is a presumption of negligence calling for proof by the tug that it was not negligent.[1]

The difficulty with libelant's case is that the evidence is not convincing that the barge on the occasion in question was seaworthy. As summarized by libelant's witness, Orrell, after he heard the evidence, the capsizing could have been due to one or more of four causes: 1) instability, 2) water in the barge, 3) improper loading or shifting of the cargo, 4) improper seamanship on the part of the tug.

The cement was loaded into the tanks in such a way that it may have shifted. While Cowan testified that he inspected only one of the barge's 10 compartments, the No. 4 port compartment, and pumped water out of No. 1 port compartment until the pump stopped pumping, he made no inspection of the other compartments and the evidence is not convincing that there may not have been water in some of the other compartments which could have caused the unusual listing. This, in turn, could have caused the cargo to

1. The Webb, 14 Wall. 406, 20 L.Ed. 774; The Ellen McGovern, D.C., 27 F. 868; The Joseph B. Thomas, 9 Cir., 86 F. 658; The Kalkaska, 7 Cir., 107 F. 959; The Genessee, 2 Cir., 138 F. 549; The W. G. Mason, 2 Cir., 142 F. 913; Inland & Sea-board Coasting Co. v. Tolson, 139 U.S. 551, 11 S.Ct. 653, 35 L.Ed. 270; Burr v. Knickerbocker Steam Towage Co., 1 Cir., 132 F. 248; The Marie Palmer, D.C., 191 F. 79, and numerous other cases.

shift sufficiently to account for the sudden capsizing.

 At the conclusion of libelant's evidence, the court was left to conjecture as to what might have caused the barge to capsize. This is not sufficient; and, since libelant offered no evidence of improper handling on the part of the tug, it failed to discharge the burden. The mere fact that the barge was in good order when received and in damaged condition when delivered does not raise a presumption of negligence on the part of the tug. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; Stall & McDermott v. The Southern Cross, 5 Cir., 196 F.2d 309. If the tow sinks under normal conditions it is to be presumed that it was unseaworthy unless there is proof of negligence. The Senator Rice, D.C., 15 F.2d 882, affirmed 2 Cir., 15 F.2d 883.

 Libelant correctly says it does not have the burden of showing a *particular* act of negligence; but this does not change, under the doctrine of res ipsa loquitur, libelant's burden of showing from all the circumstances some negligence. Geotechnical Corp. of Delaware v. Pure Oil Co., 5 Cir., 196 F.2d 199. The res ipsa loquitur doctrine does not *compel* an inference of negligence. Austerberry v. United States, 6 Cir., 169 F.2d 583. Somehow, as libelant developed its case, it left me with the feeling that Barge 403, notwithstanding its previous trips without mishap, may have been topheavy as loaded on November 19th; or that the cement could shift, or that water could have gotten into some of the compartments; and that any, or all of these factors, could have caused it to capsize; especially since libelant did not call, even as adverse witnesses, a member of the tug's crew but contented itself with introducing respondent's admission in the pleadings that the barge had capsized. In my opinion this did not call for any evidence from respondent.

. The foregoing is adopted as findings of fact and conclusions of law.

Libelant's motion for reconsideration is overruled. A decree for respondent is being entered. The Clerk will notify counsel.