**The OFFSHORE COMPANY, as Owner of DRILL BARGE RIG 58, Libellant,**

v.

**G & H OFFSHORE TOWING CO., Inc., and the TUG JUNO, Respondent.**

**No. 64-H-88.**

United States District Court
S. D. Texas,
Houston Division.

June 10, 1966.

Vinson, Elkins, Weems & Searls, Houston, Tex. (Robert M. Julian), Houston, Tex., for libellant.

Royston, Rayzor & Cook, (M. L. Cook,) Houston, Tex., for respondent.

CONNALLY, Chief Judge.

The libel is one to recover for damage suffered by the Drilling Barge 58 on or about January 17, 1964, while she was in tow of the Tug JUNO in the Gulf of Mexico. By cross-libel, the respondent, as owner of the tug, seeks to recover a portion of the towing charges, which admittedly has been withheld by the libellant; certain additional or "detention" charges by reason of delay resulting from deviation from course for repairs to the 58, and attorneys' fees.

The contract of towage is in writing, and I refer thereto for a detailed statement of its terms. Briefly, it provided that the JUNO would pick up Barge 58 at Beacon No. 7, off the coast of Morgan City, Louisiana, and tow her to Breighton, Trinidad for a fixed sum. It further provided that if the tow put in to port during the voyage for repairs or alterations to the tow, or because of any other

reason for which the tow might be responsible, additional compensation at a fixed daily rate was to be paid. A further provision was to the effect that the respondent "shall have the benefit of all exemptions from, and limitations of, liability to which an owner of a vessel is entitled under the Limitation of Liability Statutes of the United States and that they shall have all of the rights, immunities, and exemptions that are accorded to a ship and to a carrier under Title 46 U.S.C.A. Section 1304 (Carriage of Goods by Sea Act).[1]

Drilling Barge 58 is owned by the libellant, The Offshore Company. She is an all-welded steel barge built in 1960. She is approximately 100 feet long and 80 feet wide. Her hull is of $\frac{1}{2}$ inch steel plate. Immediately prior to the voyage she was carefully inspected and surveyed, and was found to be in good order and seaworthy in every respect. She and her sister ships previously had been towed without incident to practically all of the offshore oil producing areas of the world.

The Tug JUNO is owned by the respondent and cross-libellant. She is a seagoing tug of 197 gross tons, 100 feet in length, 27 feet in width, and with a draft of 12 feet 8 inches. At the time in question, she was in regular service of this nature, with crew, power, and equipment sufficient to accomplish this towage routinely.

The JUNO took the unmanned Barge 58 in tow at the assigned spot at 3:00 p. m., January 9, 1964, on a 1600 ft. towing cable, and the voyage began. Within the next few days, the flotilla encountered rough and very rough seas. Both vessels rolled heavily. However, nothing untoward occurred during this interval with the tow. On January 10, the JUNO lost all radio contact with marine operators ashore, and on or about January 12 the LORAN set became inoperative. The evidence does not suggest that either of these resulted from the weather conditions. The loss of radio contact is noted in the log and this continued until the radio was repaired January 20.[2] The loss of the LORAN is not noted in the log. Thus, by reason of cloudy and overcast weather which prevented their sighting of the celestial bodies, the officers of the tug were able to fix their locations thereafter only by dead reckoning estimate until about noon of January 18. As hereinafter noted, these estimates were grievously in error and such error was a vital consideration in later decisions.

Shortly after daylight of January 17, the Captain of the JUNO noted that the Barge "seemed to be going down by the head." A log entry at noon of that date was to the effect that "58 had settled by the head app. 3 ft.". At this time both tug and tow were rolling in very rough seas. The Captain reduced speed slightly. As she was out of radio contact and unable to secure instructions, and as the navigator fixed the JUNO's location by dead reckoning at a point almost through the Yucatan Straits (where the flotilla would have been confronted with a strong adverse current), the Captain felt the wiser course was to proceed. The JUNO held her course. As high a speed was maintained as weather conditions, and safety to the towing cable, permitted.

Between noon and 3:00 p. m. of January 18, a number of important developments took place. The Barge was noted to be down by the head some four to five feet. As the weather had moderated somewhat, speed was increased. Weather also permitted a closer inspection of the Barge, and the tug reversed for this purpose. It was found that she was down to such an extent that her deck was awash. At about this time the weather cleared sufficiently for the officers of

---

1. The Carriage of Goods by Sea Act provides, in part (Section 1304), that the vessel shall not be liable for "(a) Act, neglect, or default of the master, mariner, pilot or the servants of the carrier in the navigation or in the management of the ship;".

2. The Captain put in three hours of overtime repairing the radio. He found two loose wires and repaired them.

the JUNO to determine her correct position. They found—to their surprise—that she had made much less headway than supposed, and rather than being some 90 miles to the southeast of Cape San Antonio (being the western tip of Cuba) and having passed through the Straits of Yucatan, in fact she was some 60 miles to the northwest of the Cape and was only approaching the Straits. Hence, being some 150 miles farther from his destination than he had thought, the Captain of the JUNO changed course for Key West, Florida (thus securing the benefit of a favoring two knot current) as a port of refuge. From that point forward, the weather abated and the remainder of the voyage to Key West was uneventful. No member of the JUNO crew was put aboard the 58, nor was she pumped out, during this interval. She arrived at Key West the evening of January 21 with her bow under water, but still afloat.

Repairs were made in Key West. It was found that Barge 58 had suffered rather widespread damage at various spots completely across her forward end. The steel plating had been dented and punctured, and her welded seams split open. There were five holes which from the pictures in evidence appear to vary in size from a split perhaps 2 inches wide to a puncture about the size and shape of a football. Sea water had not only entered her hull, but had done extensive damage to the electrical wiring and equipment within her deck housing. The damage had obviously been inflicted by some heavy object or objects which had come in violent contact with the hull during the towage. There is no evidence whatsoever as to precisely what caused the damage. The crew of the JUNO have testified that they have no knowledge of the cause. The Barge, as stated, was unmanned.

The libellant has suggested that the tug may have backed down upon the tow. The crew of the JUNO deny this, and there is no evidence that any damage was apparent to the tug. The Captain of the JUNO suggests contact with partially submerged floating objects such as logs or debris may have caused the damage. Not only did he testify to having seen a number of such partly submerged objects on January 16 (the day before the list was detected), but made an entry in the log book under that date to this effect. I do not credit this testimony. From its location in the log book and from the reservations which I entertain with respect to other testimony of the JUNO's captain,[3] I am of the view that this entry was inserted long after Janu-

3. As an illustration of my doubts as to the testimony of Captain Ives, I cite the following. It should be borne in mind that the captain (Ives) and the second officer-navigator (Williams) both have testified that during the morning of January 18, and no later than noon of that date, actual sightings on the sun showed the true position of the flotilla, and that this fact was an important consideration in their change of course for Key West. This position showed that the vessel was not in or near the Yucatan Straits and had never been.

The log book notation of 2:55 p.m. of January 18 made by the captain reads in part as follows: "Rig down by head so deep that cannot make any headway against current in Yucatan Straits." Proctor for respondent suggests that this language is ambiguous and does not mean the captain meant the JUNO was in the Straits, but should be read to mean that if he proceeded forward, and thereafter encountered these currents, he could not make headway. This explanation might be accepted were it not for the fact that a statement which Captain Ives made shortly after arriving at Key West on January 21 reads in part as follows: "In the Yucatan Strait January 16, 1964, tug JUNO encountered gale force winds from SE * * *. On January 18, 1964, * * * the rig was down by head so far that tug could not make headway against current in Yucatan Strait." Additionally, in his deposition taken November 25, 1965 (p. 25) in referring to the difficulties confronting the JUNO at 8:30 a.m. January 17 (when the list was detected) he states, "You couldn't go slower without going backwards with the current through the Yucatan. We were just about holding our own, and that was about all." Similar expressions as to his position in the Straits appear on pages 29 and 41 of the deposition.

ary 16th, with an eye to the trial and the need for an explanation of the damage.

The evidence as recited above is without dispute. An abstract statement of the applicable law also seems to be clear. But it does not follow that decision of the case is a simple task. In my judgment, the question is very close.

The respondent relies on Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699 (1932), and the cases which follow this authority, such as Stall & McDermott v. The Southern Cross, 196 F.2d 309 (5th Cir. 1952); New Orleans Coal, etc. v. United States, 86 F.2d 53 (5th Cir. 1936); South, Inc. v. Moran Towing & Trans. Co., 252 F.Supp. 500 (S.D.N.Y.1965), affirmed by the Second Circuit, South, Inc. v. Moran Towing Co., 360 F.2d 1002, May 27, 1966; Sentell v. Gibson Bros. Towing Co., 173 F.Supp. 737 (S.D.Ala.1959); Halliburton Oil Well Cementing Co. v. Stellman Trans. Co., 123 F.Supp. 568 (S.D.Tex.1954); The Lapwing, 56 F.Supp. 859 (E.D.La.1944).

■ From these authorities, the following principles are established:

(a) An agreement to tow does not impose the liability of an insurer, or of a common carrier, upon the tug;

(b) A contract of towage does not create a bailor-bailee relationship;

(c) An action by the tow against the tug is ex delicto, not ex contractu;

(d) The tow must prove negligence on the part of the tug to recover;

(e) No presumption of negligence arises merely on proof that the tow was in good condition when delivered, and in damaged condition when returned.

■ The libellant contends that negligence is shown here, not by direct evidence of what happened, but because (it is argued) that the circumstances here create a presumption of negligence—that damage of this nature is not inflicted across the leading edge of a steel plated barge unless there be negligence on the part of the tug—and that the burden is imposed on the tug to explain. In the absence of an explanation showing the tug to be free of fault, it is argued that liability follows. The libellant relies on Detyens Shipyards, Inc. v. Marine Ind. Inc., 349 F.2d 357 (4th Cir. 1965); Bisso v. Waterways Trans. Co., 235 F.2d 741 (5th Cir. 1956); Sternberg Dredging Co. v. Moran Towing & Trans. Co., 196 F.2d 1002 (2nd Cir. 1952), on reh. 200 F.2d 603; The Anaconda, 164 F.2d 224 (4th Cir. 1947); Simkins v. R. L. Morrison & Sons, 107 F.2d 121 (5th Cir. 1939); The Stirling Tomkins, 56 F.2d 740 (2nd Cir. 1932); The Clarence P. Howland, 16 F.2d 25 (2nd Cir. 1926). These cases I believe without exception, cite and recognize the rule of Stevens v. The White City and her progeny, but announce the rule as contended for by libellant. The following quotation from Bisso v. Waterways Trans. Co., supra, is typical:

"This brought into play the sensible rule that, even though the engagement is in contract so that the duty of the tug toward the tow is that of due care only, with the consequent burden on the tow of establishing negligence [citing cases], a stranding which occurs under circumstances which ordinarily results in no such casualty puts on the tug the obligation of some satisfactory explanation. 'When an accident occurs to the tow the action is ex delicto and the burden is on the tow to show negligence on the part of the tug. However, circumstances may create a strong presumption of negligence. In that event the burden is on the tug to rebut the prima facie case or, at least, to show a reasonable excuse for the accident other than its own negligence. * * *'" 235 F.2d 741 at p. 744.

The other authorities cited by libellant contain similar statements.

■■ I am not sure that the cases may all be reconciled; for while all those cited by libellant pay lip service to Stevens v. The White City, in a number of instances the courts base the finding of the tug's negligence on what seems to be rather nebulous and uncertain grounds. At any event, the question pre-

sented is whether the incident causing the damage is of such nature that it would not normally have happened had the tug exercised due care. In my judgment that is not the case here. In all probability the damage resulted from collision with one or more floating objects on the night of June 16–17. When it is borne in mind that the Barge was riding more than one-quarter mile behind the tug, that she was rolling in very rough seas, and that the damage apparently happened during the hours of darkness, I am of the view that such damage well might occur without knowledge of the tug's crew, though they be in the exercise of due care, and keeping the most careful watch for her safety. The risk of striking a floating object (if, in fact, this caused the damage) is a peril of the sea, a risk which is borne by the tow [see, Utah Home Fire Insurance Company v. Mechanical Equip. Co., 242 F.2d 513 (5th Cir. 1957) and cases there cited; New Orleans Coal, etc. v. United States, 86 F.2d 53 (5th Cir. 1936); Sentell v. Gibson Bros. Towing Co., 173 F.Supp. 737 (S.D.Ala.1959)], and from which a presumption of negligence does not arise. Hence the libellant has not shown fault on the part of the JUNO causing the initial damage to Barge 58.

 The second prong of libellant's attack is better taken. The failure to take prompt action for relief of the Barge, after discovery of her difficulty, shows such a lack of judgment and skill on the part of the JUNO's officers as to render her liable for the damages which result therefrom. Respondent argues that one now has the benefit of hindsight; that the tug had heavy weather, rough seas, a miscalculation of her location, and a lack of communication to contend with; and that when faced with an emergency, the captain of the tug is only required to use his best judgment under the circumstances as they then appear, and that the tug is not to be cast in damages if subsequent events show that some other course might have been more advantageous. There is force in this argument. But much of the JUNO's difficulty was of her own making. She did not know her location because her electronic gear had gone out and was not repaired. She was unable to communicate with her owners, or those of the tow, or to receive weather information or other data during the critical period because her radio was inoperative; repaired, apparently with little effort, some few days later. Despite the fact that the condition of the Barge continued to worsen, the JUNO plowed ahead against adverse currents for a period of thirty hours rather than taking immediate advantage of a favoring current toward Key West. I do not credit the testimony of her master that the seas were so rough that he could not effect the change of course which this would have called for. This conduct shows a callous indifference to the welfare of the tow and no doubt greatly increased the damages which she suffered, for which the tug may not escape responsibility. Chemical Trans. Inc. v. M. Turecamo, Inc., 290 F.2d 496 (2nd Cir. 1961); Sternberg Dredging Co. v. Moran Towing Co., supra; The Joseph F. Clinton, 250 F. 977 (2nd Cir. 1918).

 Respondent replies to the charge of negligence by reliance on the exculpatory provisions of the Carriage of Goods by Sea Act incorporated by reference in the contract of towage as noted in the opening paragraphs hereof. The answer to this contention is the holding of Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (1955), wherein the Court states:

"Viewed in the light of this history, we think The Steamer Syracuse [12 Wall. 167, 20 L.Ed. 382], The Wash Gray [277 U.S. 66, 48 S.Ct. 459, 72 L.Ed. 787] and intervening lower court cases together strongly point to the existence of a judicial rule, based on public policy, invalidating contracts releasing towers from all liability for their negligence. Because of this judicial history and cogent reasons in support of a rule outlawing such contracts we now, despite past uncertainty and difference among the circuits, accept this as the controlling rule." Id. at p. 90, 75 S.Ct. at p. 632.

Respondent suggests that *Bisso* was wrongly decided, and that it will soon be overruled; and urges that it should be followed only in cases of inland towing, and where the evidence shows a lack of competition in the towing business. There is evidence here that there is much competition among the seagoing towers. But *Bisso* has been followed as recently as 1963 [Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963)] without qualification, and I decline the invitation to be the first to overrule it.

From the date of the filing of this libel, every contact between the proctors for the contesting parties has been marked by wholly unnecessary heat and friction. The fixing of bond, production of witnesses for deposition, answers to interrogatories, all have necessitated application to the Court. The respondent has deliberately submitted an admittedly erroneous invoice for the deviation time. Proctor for the respondent states that he learned only on the day of trial that libellant admitted owing an additional amount on the towage fee and was withholding it as an offset—a fact with which the Court was familiar from the first in-chambers conference perhaps a year ago. Proctor for libellant has referred the Court to an accident report, intimating that it pertained to the accident in question, when in fact it related to an entirely different occurrence. Such conduct has not been of assistance to the Court in disposition of the case, and reflects no credit on the able and experienced proctors involved. Zeal in a client's behalf does not require this.

Libellant may recover for damages to the Barge 58 resulting from the delay in getting her to Key West. Respondent and cross-libellant may recover the amount admittedly withheld on the towing fee, and for the deviation calculated as though it had begun no later than noon on January 17. Recovery may not be had for deviation time incurred through fault of the tug. As the invoice on which cross-libellant sought to recover admittedly was false, attorneys' fees are not allowed. The foregoing is adopted as Findings of Fact and Conclusions of Law.

Proctor for libellant will submit appropriate decree; will submit same to the proctor for respondent who will either approve it as to form or note thereon that he declines to approve it as to form, in which event he will advise the Court his objections in writing.