## MASON v. THE STEAM-TUG WILLIAM MURTAUGH.

*(District Court, S. D. New York. June 17, 1880.)*

1. NEGLIGENCE—PILOT OF TUG.—The pilot of a tug shows want of ordinary care in attempting to cross the bay of New York with a boat in tow, while the hatches of such boat are uncovered, and the wind is blowing from the west to the north-west at the rate of about 21 miles an hour.

2. SAME—SAME—CUSTOM.—The existence of a custom of thus using a boat with uncovered hatches, when loaded with coal, in order to save expense in trimming, will not relieve the tug from liability.

3. SAME—SAME—UNSEAWORTHINESS.—The want of such hatch covers was an obvious defect, and will not, therefore, relieve the tug from liability upon the ground of unseaworthiness, where the boat was lost in direct consequence of such defect.

4. CONTRIBUTORY NEGLIGENCE—MASTER OF THE BOAT.—In such case the acquiescence of the master of the boat, who had had a long experience as a boatman in crossing the bay at all seasons, constituted contributory negligence.

White v. *The Steam-tug Lavergne,* 2 FED. REP. 788, distinguished.

*F. A. Wilcox,* for libellant.

*E. D. McCarthy,* for claimant.

CHOATE, D. J.   This is a libel brought by the owner of the barge J. Stackpole, to recover the value of the barge and her cargo of coal, alleged to have been lost through the negligence of the steam-tug, which undertook to tow her from Port Johnson to New York, on the twenty-ninth day of November, 1879.   The tug left the stakes near Port Johnson on that day, about 2 o'clock, with a tow of ten boats, including the J. Stackpole, which was placed in the hawser tier, being the outside boat on the port side.   After rounding the canbuoy, which is just below Robbins' Reef, and while proceeding slowly on her way up the bay, the barge was found to be in a sinking condition.   She was cast off from the tow, and sunk, with her cargo.   She had three hatches, each about six feet by eight, and another opening in her deck, about a foot square.   She had a cargo of about 225 tons of what is called buckwheat coal, the smallest kind of coal above coal dust. She was 97 feet in length, and 22½ feet in width.   Her plank sheer was about 18 inches above the water,   She had a log rail about nine inches high, with scuppers a foot long by three or four inches wide.   The combings of her hatches were nearly as high as her rail.   She had no coverings for her hatches, and the coal was piled up above and around her forward and after hatches.   The middle hatch was clear.   It is a conceded fact in the case that the cause of her sinking was the taking of water on her decks and through her hatches, and the other opening in her deck.   The wind had been blowing from the west to the north-west since early in the morning, a fresh breeze, which had increased so that when the tug started from the stakes it was blowing at the rate of about 21 miles an hour.

The libellant charges the tug with a want of due care, among other things, in leaving the stakes and attempting to cross the bay of New York with such a wind blowing, and with the libellant's boat in the condition in which it was with respect to its open hatches and deck. The tug charges that the loss was occasioned wholly by the unseaworthy condition of the barge, in having its hatches uncovered, and in having the fine coal on its deck, above and around its hatches, which is claimed to have absorbed and held the water so as to greatly increase the weight of the cargo and to prevent the pumps from clearing her of the water that she shipped. Other faults are charged against the tug: having too heavy a tow for her to manage, not seeking a place of safety when she reached the can-buoy and found it dangerous to proceed, and starting so early that she reached the can-buoy so long before the change of tide from ebb to flood that the tow was exposed for an unnecessary length of time to the rough water at that part of her passage. These other grounds of complaint I do not think, upon the evidence, are fairly made out.

The question of the responsibility for the damage caused by taking in water through the open hatches is a very important one both to tugs and tows. It is claimed on behalf of the tug that the day was suitable for her to attempt the voyage with her tow; that the wind was not high enough to suggest to the pilot of the tug, or to the captains of the boats in the tow, any peril to the tow in crossing the bay. It appears in the case that several other tows crossed the bay that day, some of them with loaded boats without hatch coverings. And it is argued that it was, at most, an error of judgment, and not a want of ordinary care, for the pilot of this tug to venture on the voyage on that day. But the fact that other open boats were safely towed across the bay on that day has little or no tendency to show that it was consistent with the exercise of ordinary care on the part of this pilot to attempt the passage with this boat. The rules of navigation prescribing the degree of care and diligence on the part of those charged with the responsibility for property on the sea are

not framed merely to guard property against loss or damage that is probable, but against injury and loss which, though improbable, may, in the exercise of proper skill, be foreseen as possible, and which, by the exercise of care and prudence, may be guarded against or avoided. Thus, fifty steamships may run at full speed through a dense fog without disaster, yet if the fifty-first comes into collision with another vessel it would be no answer to the charge of negligence that the fifty did the same thing safely.

The question of ordinary care is not to be determined by the numerical chances of disaster upon a given state of facts. So, it is no argument against the claim of this libellant that many other open loaded boats crossed the bay in safety that day, or that many other pilots of tugs took out similar tows. The test is not what other men do with their own property under the like circumstances, but what would a *prudent* owner do. There are thousands of men in the community who take risks with their own property, and with the property of other people entrusted to them, which are inconsistent with this rule of diligence enforced by the courts as the test of responsibility. The question in every case is one for the court to decide on the particular circumstances, whether the degree of care, caution, and diligence has been used which the rule requires; and I have no difficulty whatever in coming to the conclusion that there is a want of that ordinary care which a prudent owner would exercise in the care of his own property for a tug to attempt to cross the bay of New York with a loaded boat without hatch covers, with the wind and sea as they were shown to be that day.

There was nothing in the state of the wind or of the sea on the bay which was not fairly within the knowledge or apprehension of the pilot when he left the stakes with his tow. Pilots of tugs must clearly be held to be fully aware of the effects of the wind on the waters of the bay. This boat was not exposed to the action of the rough water of the bay more than half an hour, yet the waves were high enough in that time to swamp her, in the condition in which she was; and there is

no proof of a sudden or unexpected increase in the wind or sea which might excuse the tug. It is said that a custom has grown up of using boats and barges, in the coal trade, with what may be called, substantially, an open deck,—that is, without any deck except a narrow planking along the sides of the boat, and a short deck at the two ends,—and that this custom has grown out of the desire to save expense in trimming the boat if the cargo is put on board at hatches.

It is said, also, that although a boat so constructed can have, and sometimes has, a series of hatch covers, covering the entire opening in the deck, yet the practice has been to use such boats without any covering, as well as to use decked boats without any hatch coverings, in the carriage of coal between the coal ports of New Jersey and New York across the bay. It is claimed that this practice justifies tugs in taking these open boats to tow across the bay even in winter time and through rough water, and that to hold the tug liable in such a case will very injuriously affect the business of the tow-boats. I do not perceive that such a practice can affect the question. Many practices grow up in the navigation of the seas, and gain more or less acquiescence, partly from motives of self-interest, and partly from a supposed necessity of conforming one's business action to what others do under similar circumstances in the competition for employment; but such practices, if inconsistent with the standard of care and prudence which the courts of admiralty steadily adhere to for the preservation of life and property, can receive no countenance from the courts.

It is, however, still insisted that the tug is not responsible for the loss of this boat because she was lost from the direct consequence of her want of hatch covers; that she was, for this reason, unseaworthy, and that a tug is not liable if the loss happens from the unseaworthiness of the boat taken in tow. It is undoubtedly true that a master of a boat, offering his boat to be towed, represents her as seaworthy, or fit for the voyage, and sufficiently strong, staunch, and sound to meet and withstand the ordinary perils to be encountered

upon the voyage; and, in many cases of the loss of the boat towed upon the voyage, the tug has been absolved from responsibility because of the unseaworthiness of the tow, and her inability, by reason of weakness and decay, or of leaks, to bear the voyage; but there is an obvious distinction between defects or unfitness for the voyage, which can be seen and must be appreciated, upon the most casual inspection of the boat, and such as cannot be so seen. If the unfitness consists in what is perfectly obvious to the pilot of the tug when he takes the boat in tow, then clearly the tug undertakes to use a degree of care measured according to the obvious condition of the boat. If the unfitness is not thus obvious, he undertakes only for that degree of care which is proper and necessary for the management of a sound and seaworthy boat, as she is presumed to be; and to hold the tug liable for her loss arising from her unknown defects, in such a case, would be grossly unjust, and would enourage fraud and deceit. But the unfitness in the present case was obvious, and known to the pilot of the tug when he took the boat in tow. She was loaded, and had no hatch covers, and this was too obvious to escape his attention. Indeed, the proof is that he knew the fact. Therefore, he was bound not to tow her across the bay, in that condition, in the state of wind and tide existing.

The pilot of the tug, or whoever on its behalf makes up the tow, and decides when and under what circumstances of wind and weather the voyage is to be made, assumed to determine these questions for the boats in the tow, with the ordinary care of a prudent owner in dealing with his own property, and in this respect those having control of this tug failed to exercise that degree of care and diligence. It was not, as suggested, *merely* an error in judgment in choosing between two possible courses. It was negligence, which makes the tug liable for the ensuing damage. The question still remains, however, whether the master and owner of the boat towed was not also chargeable with negligence that contributed to the loss, in that he permitted his boat to be taken out in an unsuitable state of the wind and weather.

In the recent case of *The Steam-tug Lavergne* [2 FED. REP. 788] I had occasion to consider a similar question. In that case the damage to the tow, which was a light canal-boat, was caused by its pounding against the side of the tug while the latter was rounding to, and thus bringing the canal-boat broadside to the wind and sea, in landing another boat which was fastened to the other side of the tug. In that particular case it was held that the peril to the tow, while it was one which the tug must be held bound to have anticipated, and guarded against or avoided, was not so obvious that the master of the canal-boat, in permitting his boat to be taken in tow with knowledge of the fact that the other boat was to be landed as it was, or in·not objecting to the tug's rounding to as she did to effect that landing, was chargeable with negligence in thus permitting his boat to encounter the peril by which it sustained damage. It was held to be a matter so peculiarly within the knowledge and technical skill of the pilot of the tug, that, whatever doubts the master of the canal-boat may have entertained as to the propriety of the movement, the judgment of the pilot of the canal-boat might be justly and properly held to be overborne by, and, without fault on his part, submitted to what must have been assumed to be, the superior judgment of those in charge of the tug. The question involved was in that case held to be a question of technical or expert knowledge in the handling of a tug and tow, rather than a question of common knowledge or diligence not involving technical skill. But, it was said in that case, "there may be cases where the danger about to be incurred is so very obvious that the master of the canal-boat may be chargeable with contributory negligence in voluntarily exposing his boat to the peril without objection."

In the present case there was no remonstrance·or objection on the part of the captain of the canal-boat, and it was proved that he had a long experience as a boatman in crossing the bay at all seasons of the year. In my judgment, the peril incurred in this case was not one which it required any technical skill to foresee or appreciate. It was one which was patent and obvious to any person in the habit of navigating

the waters of the bay of New York, and not such that the master of the canal-boat could successfully plead that his judgment was controlled or overborne by any superior knowledge or judgment on the part of the pilot of the tug. I think it is so obviously dangerous to attempt to cross the bay with such a wind and sea as there are shown to have been on that day, that the peril about to be encountered was within the common knowledge of all canal-boatmen of any experience, and therefore that the libellant's want of ordinary care in allowing his boat to be taken out—a matter entirely within his own control—must be held to be contributory negligence. By the rule of liability which obtains in the admiralty, where both parties are chargeable with negligence which causes the loss, the damage is equally apportioned between the parties. In conformity with this rule, the libellant is entitled to a decree for half his damages.

Decree for the libellant for one-half his damages, with costs, and a reference to compute the damages.