## THE REVERE.

## THE A. C. DUTTON LUMBER CORPORATION NO. 5 et al.

### Nos. 245–247.

Circuit Court of Appeals, Second Circuit.

March 13, 1933.

Foley & Martin, of New York City (James A. Martin, of New York City, of counsel), for appellant.

William F. Purdy, of New York City (John E. Purdy, of New York City, of counsel), for the Barges No. 5 and No. 7.

Bigham, Englar, Jones & Houston, of New York City (Andrew J. McElhinney, of New York City, of counsel), for Dutton Lumber Company.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This cause is a consolidation of three libels; one, by the owners of the floats No. 5 and No. 7, against the tug, "Revere"; another, by the owner of their cargo; the third, by the tug against the floats for salvage services. The judge gave a decree for the libellants on the first two, and dismissed the third. The tug appealed in each.

The facts were as follows: The tug, "Revere," with the float No. 7 to port and No. 5 to starboard, was bound into Stamford Harbor on the morning of January 7, 1929. No. 5 was destined for that place; No. 7 was to go further, and it was the tug's original purpose to leave her at anchor off the buoy marking the western side of the harbor, while she took No. 5 to her wharf. She got to the entrance buoy about nine, and thought the weather too heavy to drop No. 7; the wind was out of the southwest, blowing strong. Stamford Harbor is embraced between Shippan Point on the east, and a shoal on the west at the southern end of which is the entrance buoy we have mentioned. Two buoys mark the eastern end, on the two fathom line; a third is up near the eastern entrance of a narrow dredged channel, leading to the city. The tug with her tow rounded the western buoy by a wide berth, and made up for the dredged channel, thinking to leave No. 7 in a basin east of it, some distance above its entrance. The floats were stowed with a deck cargo of lumber fifteen feet high, and either from the force of the wind, or the mismanagement of the tug, or both, she went aground just below and to the east of the buoy at the entrance of the dredged channel. Finding herself in this embarrassment, she ordered No. 5 to cast off, which she did, and as the tug backed out, swinging her stern to the wind, No. 5 swung end to end to No. 7. By her own story the tug now pulled them across the channel, and then before casting loose, ordered No. 7 to drop her anchor, which she did. As she swung to this, No. 5 came alongside of her and the two then dragged back under the wind across the channel. The tug, after some rather meaningless manœuvring, came back, tried to heave a line aboard, but could not get close enough, and left for Stamford to get help. The two floats drifted further to leeward and finally fetched up at a distance variously estimated, but found by the judge to have been five hundred feet off shore. Some of the cargo was damaged after the floats went ashore, and the libels were for the damage to it and to the hulls. The tug's libel was for her assistance in getting the floats off the strand. The version of the floats differs a good deal in what happened after the tug went aground. They dispute that she pulled them across the channel, and that they dragged back again to where they had been or near it. They say that they remained about where they were till the tug left. Again, there is much confusion as to whether they dragged No. 7's anchor at all, after she left; some of their testimony seems to indicate that they were already aground. The judge made no express finding, except as is involved in the place where they took the strand. However, since that was at some distance from where the tug left them, the finding must be treated as the equivalent, and the weight of the evidence certainly bears out the conclusion.

Although the tug seeks to excuse herself by stress of weather, it is clear that she cannot escape. Estimates of mariners as to the velocity of the wind made on the spot are unreliable, especially when made by interested witnesses. We prefer to take the observations at the weather bureaus in New York and New Haven, half way between which Stamford lies. Between nine and ten on the morning of January seventh, the total wind movement at New York was twenty-seven miles, at New Haven twenty-four; the re-

spective maximum velocities were thirty and twenty-six. It is therefore reasonably certain that at Stamford the New York figures were not equalled: the wind was never thirty miles, and a tug starting out in January was bound to expect so much. Indeed when she left Brooklyn at four o'clock that morning the hourly wind movement was already twenty-one miles. The excuse will not serve (The Wyomissing, 228 F. 186 [C. C. A. 2]), and we need not concern ourselves with the precise faults of which she was guilty, though we believe that she should have hugged the west entrance buoy more closely, and that she got into trouble because she did not hold off far enough from the east side of the harbor, the two fathom line.

■ Her defence to the floats' libel rests upon the failure of No. 5 to let go her anchor after the tug left, and she saw that No. 7's was not holding. While the tug was still there, the floats were under her direction, and were not to complicate her management by independent action. Cranberry Creek Coal Co. v. Red Star T. & T. Co., 33 F.(2d) 272 (C. C. A. 2). Even on her own showing they had already drifted back, dragging No. 7's anchor, to about the place where she herself went aground. This was within the one fathom line on the chart, and it is indeed reasonable to suppose that she had gone aground inside that line, because it was still half tide, and she drew only nine feet. In any case

the original strand is put inside the line. The floats swung to No. 7's anchor with a scope of fifteen fathoms; they were themselves two hundred and fifty feet long. As the wind was out of the southwest, and continued all day from that quarter or from the west, the floats, if No. 7's anchor had held, would have been far within the one-fathom line. When the tug left at ten o'clock, it was about half ebb, and therefore low water was between twelve and one o'clock; when she got back from Stamford at one, the floats were aground. They drew five and a half and six feet, and it is clear that they might have gone ashore where she left them, and in all probability would have done so without dragging. The bottom was covered with stones and boulders, of which there may have been some below their original position.

■ The fault charged against No. 5 for her failure to drop her anchor when she saw that No. 7's did not hold, is a defence for the tug to prove. Not only must she show that the anchor was not dropped, but that it would have avoided the loss, if it had been. The Bartle Daly, 45 F.(2d) 605 (C. C. A. 2). It is the merest speculation here to say that the floats would not have gone ashore where they lay. Nor can we say that the damages would have been less; we can know nothing about it. Thus the tug stands charged, and has not made out her defence.

Decree affirmed.