## THE ADMIRAL.

### STERNBERG v. SABINE TOWING CO., Inc., et al.

### No. 7859.

Circuit Court of Appeals, Fifth Circuit.
July 14, 1936.

Brantly Harris, Geo. W. Coltzer, and Emmett F. Magee, all of Galveston, Tex., for appellant.

M. A. Grace and Edwin H. Grace, both of New Orleans, La., for appellees.

Before FOSTER, SIBLEY, and HUTCHESON, Circuit Judges.

SIBLEY, Circuit Judge.

Appellant H. J. Sternberg, doing business under the name of Sternberg Dredging Company, libeled the tug Admiral and her owner, Sabine Towing Company, for the loss by negligence of part of a tow which was taken from Sabine, Tex., to Galveston. Sabine Towing Company by cross-libel sought recovery of the towage money. On a trial in which all witnesses were heard orally (save one whose evidence is not relied on by either side), the court held there was no negligence shown and gave a decree for the towage money.

The tow was an inland dredging outfit which included a two-story houseboat, a small barge, and ten steel pontoons, and had been brought about 16 miles down the canal from Port Arthur to Sabine on the Gulf Coast, and was to be towed thence to Galveston, about 56 miles. Ball, the general manager of Sabine Towing Company, came from Port Arthur to Sabine to inspect the tow with Foley, who represented Sternberg and who was making up the tow. The items of the tow, and especially the houseboat, were not adapted to a voyage on the Gulf, and Ball refused to take them outside with any responsibility for them. Accordingly a special written contract was executed as follows:

"Sabine Towing Company, Inc., agrees to furnish their tug Admiral for the purpose of towing one fleet of pontoons, barge and houseboat from Sabine, Texas, to Galveston, Texas, for the lump sum of $200.00, the freight money to be paid upon arrival of the tow in whole or in part and no reduction to be made from the contract price of $200.00 in the event of loss or damage of any portion of the tow. In consideration of the price above quoted the Sternberg Dredging Company agrees to relieve Sabine Towing Company of any liability of any nature whatsoever against loss or damage to the tow, excepting that they do not relieve Sabine Towing Company for their own negligence. The Master of the tug Admiral is to receive orders from the agent of the Sternberg Dredging Company as to when to proceed with the tow."

Foley himself made up the tow, passing the two wire towing cables around the body of the houseboat which overhung its hull on all sides and had no bitts; the cables being held up by large nails bent over them, and in like manner encircling the barge. The pontoons were on the same lines, some in front and some behind. The wind was from the southeast then, and the barometer falling, with predictions for a "norther." Foley wished to start, but the master and Ball persuaded him to wait; all finally agreeing that the "tail of the norther" would be the best time, as a period of calm and settled weather would likely follow. Ball returned to Port Arthur in the afternoon, promising to telephone Foley at 9 the next morning the weather report at Port Arthur. Foley afterwards decided to go to Houston, and told the master to receive the weather report and to start when he thought it safe after the weather had moderated. The norther blew in about midnight. Ball testifies that "the nine o'clock report from Washington was light to moderate winds on the Louisiana Coast, that he asked the weather man at Port Arthur what the wind velocity was and he said nine to ten miles per hour and was lessening"; that he attempted to telephone Foley the information but was told that he was not at Sabine, and he talked to the master and gave him the information, and that both he and the master thought all was favorable, and the master said he would get under way. The tow, with assistance, was gotten into the channel, and by noon arrived at the jetties.

There it was lengthened out, a man going on the pontoons for that purpose, but the sea became rougher, and in the course of a few hours first the houseboat and then the dredge got out of the lines around them and went adrift and finally some of the pontoons, so that at last only the remainder of the pontoons were taken into Galveston. The houseboat, barge, and pontoons later came ashore and were salvaged.

■ Ordinarily, the tug is not the insurer of the tow, nor liable as a common carrier, nor subject as a bailee to any presumption of fault in case of damage or loss. The obligation is for reasonable skill and care, and the burden of proving a lack of it is on him who asserts it. Stevens v. White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; The Margaret, 94 U.S. 494, 24 L.Ed. 146; The Clarence L. Blakeslee (C. C.A.) 243 F. 365. The contract before us sought to reduce to the minimum the responsibility of the tug and her owner, but at last leaves them liable for negligence. Of the negligences alleged we find no evidence to support the charge that the master was incompetent or inexperienced; or that he could and should have recovered the houseboat and barge. As he explains, he could have recaptured either only by leaving and perhaps losing all the rest, and, having recaptured them, would have no means of making them fast. The houseboat had been encircled by two wire cables which crossed each other before and behind it and were held up only by large nails. It was in the center of the tow. On the choppy sea encountered she must have had upthrusts while the parts of the tow ahead of and behind her were down; the cables pulling out the nails and then falling below the projecting body of the boat into the water. There was no chance to better secure her in the face of wind and sea. So of the barge. Negligence is charged in taking a straight course across the open Gulf instead of hugging the lee shore, but the master and his assistant testified they did the latter, while only an employee of the libelant on his first voyage and very seasick testified otherwise. We cannot overrule the trial judge on this point. The strongest contention is that it was negligent to start with the weather as it was; it appearing from weather records at Port Arthur and Galveston that after nine o'clock in the morning the wind freshened at both places and blew harder as night came on. On this point the contract put the whole responsibility for the time of starting on the Sternberg Dredging Company; that is, Foley. Without the consent of Ball, he went away and left it to the master. It would be a just conclusion to. say that Foley thus made the master his agent in deciding this matter, which under the contract was Foley's responsibility. But, if we make the tug and her owner responsible for the master's act, the weight of evidence shows that, when he started on the information given by Ball that the Weather Bureau said the wind was lessening, it appeared to be the tail end of the norther, and his barometer was gradually rising, betokening fair weather. There was a slight wind only at Sabine and it offshore, and even outside the jetties it was calm enough to put a man on the pontoons to lengthen their cables. According to the master and his assistant, the rough weather was unexpectedly met two hours later, and he says he would never have started had he anticipated it. It is true that libelant's representative on the tug gives a different account, but again we ought to follow the conclusions of the trial judge who saw and heard these witnesses testify unless clearly convinced that he is wrong. We do not think it is true that Ball forced the master to start, or that when he started the wind was blowing at the rate of 12 or 14 miles an hour or more at Sabine as it was at Galveston and Port Arthur. Many witnesses testify that it often happens that there are great differences between wind velocities at Sabine and Port Arthur. We agree with the trial court that the losses which befell the tow are not shown to be attributable to the negligence of the tug or her owner, but are due to the risks which under the contract libelant took. The new evidence is not newly discovered, but negligently undiscovered, and would hardly cause a different result.

Judgment affirmed.