**STALL & McDERMOTT v. THE SOUTHERN CROSS et al.**

**No. 1020 Admiralty.**

United States District Court
E. D. Louisiana, New Orleans Division.

Feb. 16, 1951.

Deutsch, Kerrigan & Stiles and Brunswick G. Deutsch, all of New Orleans, La., proctors for libelant.

John D., M. A. & Edwin H. Grace and Edwin H. Grace, all of New Orleans, La., proctors for respondent.

WRIGHT, District Judge.

This is an action in admiralty both in rem and in personam by the owner of a tow against a tug and her owner for loss of the tow, alleging negligent towage. The case came on for trial on February 2, 1951, and was submitted upon the pleadings, the testimony of witnesses, exhibits, argument and briefs of counsel for libelant and respondent, and after due consideration thereof, the court enters its findings of fact and conclusions of law, as follows:

## Findings of Fact

1. The Quarterboat Lorraine owned by libelant was a flat-bottom wooden barge, 36' in length, 16' wide and 3' deep, whose date and place of build is unknown. Her planking was composed of 2" x 12" planks and her frames were 2" x 6". Her superstructure consisted of two wooden deckhouses, each approximately 7½' high, the main deckhouse having the same length and width as the hull of the vessel. The forward door of the main deckhouse was situated at about the vessel's center-line. Of three 24" square hatches in the main deck, the forward hatch was located just inside the forward door and slightly to port of the center-line. Porch-like structures projected forward from the bow and aft from the stern of the vessel for a distance of about 6'. The upper deckhouse had an approximate length of 20' and width of 13' and was used as sleeping quarters.

2. About a year prior to January 10, 1945, two galvanized tin fresh water tanks, measuring approximately 5' on each side, were installed in the open spaces on the upper deck forward and aft of the upper deckhouse under the direction of an employee of libelant who admittedly had no experience in shipbuilding. The forward tank was situated slightly to starboard of the center-line; the after tank, slightly to port of the center-line. Each tank had a capacity of some 900 gallons. The Lorraine's freeboard with these tanks empty was approximately 2' and with the tanks filled or approximately so, the freeboard was 18".

3. No maintenance or repair work of any kind other than painting was performed on the Lorraine for at least two years before she sank.

4. On January 8, 1945, a towage contract was made with respondent by an authorized representative of libelant, M. E. Drinkwater, superintendent of the Quarterboat Lorraine, to tow the vessel from Berwick-Morgan City, Louisiana, to White Lake, Louisiana, where libelant had a jobsite. There is no evidence in the record to indicate how long the Lorraine had been laid up at Berwick other than testimony to the effect that she had not been used on the last "job or two" by libelant.

5. Charles W. Gibbs, an employee of libelant was dispatched to Morgan City, Louisiana, to take fresh water and provisions aboard the Lorraine, to keep the hull of the Lorraine pumped free of water, and generally to "watch" the Lorraine while she was being towed. The Lorraine was to be used to feed and quarter a dragline crew of eight men.

6. On January 9, 1945, respondent's Tug Southern Cross proceeded to Berwick, Louisiana, to pick up the Lorraine. Prior to her being taken in tow, Gibbs, libelant's employee, pumped her free of water using the Lorraine's pump. The Lorraine was towed across the river and placed alongside the dock in Morgan City where her fresh water tanks were pressed up to an ullage of 12" to 18".

7. The Lorraine was taken in tow by the Southern Cross on January 9, 1945. Shortly after getting under way the Captain of the Southern Cross determined the safe towing speed for the Lorraine in her loaded condition was between 2½ and 3 miles per hour, and he proceeded to tow at that speed until the Lorraine capsized.

8. The Lorraine in the condition she was when taken in tow by the Southern Cross had a positive metacentric height of approximately 8". When water in her hull rose to the height of over 6" her metacentric height was so reduced that the vessel became unstable.

9. The voyage proceeded without difficulty on the first day, Gibbs keeping the Lorraine free of water with the Lorraine's pump. The tug and tow moored for the night along the bank of the Intercoastal Waterway near Baldwin's Cut, a distance of approximately thirty miles from Morgan City.

10. The next morning before proceeding at 5:30 A. M., Gibbs requested and was allowed the use of the tug's 2 to 2½" centrifugal gasoline pump and installed it on the Lorraine. He stated at the time that the Lorraine's pump pumped too fast and that he wanted a pump which would take the water out of the hull more slowly. Appar-

614

ently he also wanted a pump which would not require constant attention while in use.

11. The suction hose of the tug's pump was let down into the bottom of the Lorraine through the forward hatch. A foot valve at the end of the suction hose required an excess of 3" to 4" of water in the hull to build up a head for pumping. Consequently, when the water was pumped off down to 3" or 4", the pump would begin sucking air and thereby lose its prime. Unless again primed it would not pump water even though the pump's engine would be kept running and the water would rise over the intake or foot valve.

12. On the morning of January 10, 1945, Gibbs started the pump's engine, primed the pump, and began to pump the water off. He allowed the engine to continue running and as far as is known, the engine was still running when the vessel capsized.

13. The Lorraine capsized suddenly at 10:30 A. M. on January 10, 1945, when the water in her hull rose to a depth of more than 6". The water above 6" was not trapped in place by the vessel's frames. It was free water likely to concentrate in any part of the vessel according to the law of gravity. This water in the hull came through her seams which had not been recaulked for over two years, particularly through the seams which were above the surface when the vessel was laid up light and below the surface when she was loaded.

14. The tug's pump, which had been installed in the Lorraine, after pumping the water off down to the level of 3½ or 4" lost its prime and because it was not reprimed, it failed to start again to draw off water in spite of the fact that its engine was kept running and that the water rose again above the pump's intake.

15. When the vessel capsized Gibbs was taken off through the port window in the upper deckhouse.

16. These findings of fact represent primarily a resolution of the conflicting testimony of libelant's witness Gibbs on the one hand, and respondent's witnesses Coleman, the Master of the Southern Cross, and Aucoin, the seaman aboard the tug, on the other. Where the testimony of these witnesses has been in conflict, the testimony of Coleman and Aucoin has been preferred to that of Gibbs.

## Conclusions of Law

■ 1. The obligation of the tug to the tow is the exercise of reasonable skill and care, and the burden of proving a lack of reasonable skill and care is on him who asserts it. Stevens v. The White City, 285 U.S. 195, 52 S.Ct. 347, 76 L.Ed. 699; The Lapwing, 5 Cir., 150 F.2d 214; The Admiral, 5 Cir., 84 F.2d 616.

■ 2. When the owner of a tug contracts to transport a tow, the owner of the tow is responsible for its seaworthiness and the owner of the tug for its safe navigation. The Radnor, D.C., 21 F.2d 982; The Lizzie M. Walker, 4 Cir., 3 F.2d 921.

■ 3. There was no negligence in navigation or lack of reasonable skill and care on the part of the Tug Southern Cross which caused the capsizing of the Lorraine.

4. The Lorraine capsized when she became unstable and therefore unseaworthy through an excess of water in her hull, which water entered through her seams.

Let a decree be prepared in accordance with these findings.