The CENTRAL RAILROAD COMPANY OF NEW JERSEY, as charterer of the BARGE JANET, Libelant,

v.

The TUG MARIE J. TURECAMO, her engines, boilers, etc., and M. Turecamo, Inc. and Turecamo Coastal & Harbor Towing Corporation, Respondents.

No. 61-Ad-398.

United States District Court
E. D. New York.

Feb. 2, 1965.

---

Vincent E. McGowan, New York City, for libelant; Thomas E. Tisza, New York City, of counsel.

Hill, Rivkins, Louis & Warburton, New York City, for respondents; Allan B. Lutz, Thomas P. Pender, New York City, of counsel.

ZAVATT, Chief Judge.

■■ This action was instituted by libelant, Central Railroad Company of New Jersey, as charterer of the cement barge, Janet, to recover damages suffered by the Janet and her cargo while in tow by the tug, Marie J. Turecamo (hereinafter Marie J.). Libelant also sues as bailee of the Janet's cargo to recover damages arising from the loss of that cargo. As bailee, libelant has the capacity to do so. See The Beaconsfield, 158 U.S. 303, 307, 15 S.Ct. 860, 861, 39 L.Ed. 993 (1895); The W. C. Block, 71 F.2d 682, 683 (2d Cir.), cert denied, Cornell

Steamboat Co. v. Scholl, 293 U.S. 579, 55 S.Ct. 91, 79 L.Ed. 676 (1934). See also, Mitchell Coal Co. v. United Mine Workers, 313 F.2d 78, 79 (6th Cir.1963); Bradley v. St. Louis Terminal Warehouse Co., 189 F.2d 818, 823 (8th Cir. 1951). During the course of the trial the libelant called only two witnesses—Walter G. Struble, an employee of libelant, and Louis Evans, respondents' navigator who was in charge of the Marie J. at the time in question. Respondents called no witnesses, alleging at the close of libelant's case that there had been no proof of negligence. For the reasons hereinafter stated, it is the finding of this court that the libelant has indeed failed to establish any negligent conduct on the part of the respondents.

The Janet is a forty year old, wooden cement barge which was chartered by libelant from the Wright & Cobb Lighterage Co. The latter is a subtenant of libelant, maintaining an office and tying up its barges at libelant's Pier 10 in Jersey City, New Jersey. Testimony adduced at the trial indicates that the libelant relied on Wright & Cobb to provide good barges; that it made no examination of the Janet prior to the tow, notwithstanding the fact that its own employee testified that old wooden barges such as the Janet leak consistently. There is no evidence as to when the Janet was last pumped, caulked, dry-docked or inspected for condition and leaking prior to the tow in question. In fact, libelant's witness, Walter Struble (who has been in the employ of libelant since 1928; its lighterage agent from 1940 to April 1, 1964 and its General Agent at its freight station since April 1, 1964) testified that the barges of Wright & Cobb were left in the water all of the time—including the winter months—and were never taken out of the water and inspected after a winter season. An examination for leakage is usually conducted by the barge captain but the libelant did not have a barge captain aboard the Janet, since to do so would have entailed overtime pay. It should be further noted that another duty of a barge captain is to pump out water that leaks in during the tow.

The Janet, loaded with 232.25 tons of bulk cement, was taken in tow by the Marie J. at libelant's Pier 10 in Jersey City at approximately 1:00 A.M. on June 7, 1959 destined for a pier at 24th Avenue, Brooklyn. It was a clear night with no substantial wind. A side tow was secured whereby the Marie J. was made fast along the portside of the Janet with the Janet's stern seaward. After leaving Pier 10 the tow continued at a speed of about two and one-half to three miles per hour. About an hour later, while opposite Fort Lafayette, Evans noticed that the Marie J. was listing to port. Evans immediately sent his deckhand to the Janet's hold and was advised by him that she was leaking excessively. Evans thereupon killed all headway, called his dispatcher on the ship to shore phone for assistance and boarded the Janet with his deckhand. Boarding the Janet, Evans heard the sound of water pouring in through the seams between the planks in her stern. He and his deckhand attempted to reach the Janet's portable gasoline pump which was locked in the after deckhouse; unable to find the key, they were compelled to break the lock. From the testimony one may infer that the pump was of a vintage approximating that of the barge. Evans experienced difficulty in starting the pump and did not succeed until ten or fifteen minutes had elapsed. Despite the use of this pump, the inflow of water continued and the listing of the tug increased as the barge took on more water. At or about 3:00 A.M. another tug owned by M. Turecamo, Inc., the Turecamo Boys, arrived at the scene in answer to the Marie J.'s call for assistance. At this time the Marie J. and the Janet were drifting in the Narrows, a heavily traveled channel located at the point where the Verrazano-Narrows Bridge now spans the entrance to New York harbor. Evans testified that they were drifting because every time he would try to give the Janet a bit of a tow she would take on more and more water. The Turecamo Boys

laid to alongside the Janet, rigged its pump and put the suction hose over to the Janet. But this pump also lost ground against the rapidly incoming water; the Janet continued to settle and was causing the Marie J. to list so critically that the tug was now in danger of capsizing. Evans woke up the tug's captain who confirmed his appraisal of the situation and his conclusion that the lines of both tugs be cut immediately. When these lines were cut, the Janet settled another six inches into the water. Evans then attempted to bring the Janet towards the Brooklyn shore by taking a tow line from her stern and having the Turecamo Boys push her. This tow continued for about ten or fifteen minutes over a distance of about one thousand yards when the Janet turned over, lost her cargo and floated bottom up. She was then towed to the dock of M. Turecamo, Inc. at 24th Avenue, Brooklyn, and tied up.

■■ As noted above, libelant offered no evidence whatever as to the general seaworthiness of the Janet. Under such circumstances, and in light of the fact that she began leaking excessively in good weather and under normal conditions, she is presumed unseaworthy. See Oregon Round Lumber Co. v. Portland & Asiatic S.S. Co., 162 F. 912, 920–921 (D. Ore.1908); The Arctic Bird, 109 F. 167, 170 (N.D.Cal.1901). Respondents cannot, then, be held liable for any damages arising from the concealed unseaworthiness of the Janet. Mason v. The Steam-Tug William Murtaugh, 3 F. 404, 408–409 (S.D.N.Y.1880). But the fact that the Janet may have been unseaworthy would not necessarily absolve the respondents of all liability:

"If it be assumed for the argument, however, that (the barge) * * * was unseaworthy when the voyage began, the tug is, nevertheless, liable for any loss attributable solely to its failure to exercise due care to save the boat and cargo from that damage which it could have prevented by taking reasonable and prudent ac-

tion to protect the boat and cargo from sinking from whatever cause." Henry Du Bois Sons Co. v. Pennsylvania R. Co., 47 F.2d 172, 174 (2d Cir. 1931).

Cf. Chemical Transporter, Inc. v. M. Turecamo, Inc., 290 F.2d 496, 497–498 (2d Cir. 1961).

This principle of liability, as well as the probable unseaworthiness of the Janet, appears to be recognized by libelant; it bases the present action upon the following allegations of negligence:

(1). "When the mate (Evans) piloting the tug noticed the tug list, he did not immediately kill all headway."

(2). "The mate (Evans) failed to awaken the other crew members to assist after the peril was discovered."

(3). "The tug failed to head for shallow water promptly."

Each of these allegations, however, is without merit. Libelant's first claim of negligence, i. e., that Evans did not immediately kill all headway upon noticing the tug's list to port, has no support in either law or fact. The evidence indicates that immediately upon noticing the list, Evans sent his deckhand to the Janet to investigate. Certainly a reasonable and prudent navigator would not be expected to take corrective action until he knew what the difficulty was; one cannot volunteer a solution until he is aware of the problem. The evidence further indicates that within a matter of minutes the deckhand had returned, informed Evans of the leak, and that Evans thereupon killed all headway. His actions were perfectly consistent with the proper discharge of his duty.

■ Secondly, libelant alleges that Evans was negligent in that he failed to immediately awaken the other crew members, namely, the cook and the captain; that lacking this additional manpower, he could not change the manner of tow and work the Janet towards the shore. This contention, of course, ignores one important fact—that it was the buoyancy

of the Marie J. that was keeping the Janet afloat; that when the lines were finally cut, the Janet settled another six inches and overturned ten or fifteen minutes later. Moreover, this allegation ignores the basic theory of recovery in these actions. "It has long been settled that suit by the owner of a tow against her tug to recover for an injury to the tow caused by negligence on the part of the tug is a suit *ex delicto* and not *ex contractu.*" Stevens v. The White City, 285 U.S. 195, 201, 52 S.Ct. 347, 349, 76 L.Ed. 699 (1932). The tug is neither a bailee nor an insurer of the tow, Stevens v. The White City, supra; The Steam-Tug Margaret v. Bliss, 94 U.S. 494, 24 L. Ed. 146 (1877), and merely "owes to the tow the duty to exercise such reasonable care and maritime skill as prudent navigators employ in the performance of similar services." Stall & McDermott v. The Southern Cross, 196 F.2d 309, 311 (5th Cir. 1952). And within the scope of this standard, "[n]egligence must be affirmatively shown and the burden of proving negligence rests upon those seeking to establish liability therefor." Stall & McDermott v. The Southern Cross, supra; The Clarence L. Blakeslee, 243 F. 365, 366 (2d Cir. 1917). There is no evidence whatever that additional manpower would have prevented the subsequent damage, and it is well settled that in a case such as this the libelant must prove not only that the respondent failed to do something that it should have done, but also that had respondent done so it could have avoided the loss. The Revere, 63 F.2d 775, 777 (2d Cir. 1933).

The final allegation of negligence is that the Marie J. failed to head for shallow water promptly; that an examination of navigational charts aboard her would have revealed that there was an area of sandy bottom less than 2,000 yards from the point where the peril was discovered. Evans, however, with almost forty years of experience in New York harbor, felt it was unnecessary to consult navigational charts during the emergency; moreover, how could he proceed immediately to take the Janet to shallow water? He could not immediately cut her loose, since it was the buoyancy of the Marie J., in all probability, that was keeping the Janet afloat. He could not continue the side tow since every time he attempted to do so, the Janet took on more and more water. It must be noted that libelant did not choose to present any expert witnesses as to the propriety of Evans' actions. Rather, its attorneys seek to impugn his judgment from the shelter of the lawyer's well. The judgment of a competent sailor *in extremis* cannot be so impugned, The Oregon, 158 U.S. 186, 204, 15 S.Ct. 804, 812, 39 L. Ed. 943 (1895), and the court must accept the experienced judgment of respondents' navigator as against the hindsight of libelant's attorneys. See, e. g., H. F. Dimock, 77 F. 226, 229–230 (1st Cir. 1896). Such hindsight was aptly characterized in The Mary T. Tracy, 298 F. 528, 530 (S.D.N.Y.1920), rev'd on other grounds, 8 F.2d 591 (2d Cir. 1925):

"It was argued that the captain should have done one of several things other than to go ahead with all the power at his command. I think he decided on the best plan, but, whether he did or not, his decision was the result of a fair exercise of judgment under very difficult circumstances. The contrary view as testified by Capt. Nott called as an expert is but the old story of being able to tell, after the event, what should have been done, where the critics were not there, and were not confronted with the problem nor the emergency. There is always a Capt. Nott. Sometimes he sits by the cozy fireside, and sometimes he testifies in a courtroom. He recites how it could have been better managed, but, if the responsibility had been his, he would have been worried sick, and probably would not have done half as well."

The libelant has failed to make any showing whatever that respondents neglected to exercise such reasonable care and maritime skill as would any prudent

navigator employ in the performance of similar services. Libelant's prayer for judgment is, in all respects, denied, and the libel is dismissed with costs to respondents. Settle an order consistent herewith on or before ten (10) days from the date hereof.