The DOW CHEMICAL COMPANY

v.

M/V GULF SEAS, etc., et al.

Civ. A. No. 74–627.

United States District Court, W. D. Louisiana, Lafayette Division.

March 23, 1977.

James W. Schwing, Provost, Ernest & Schwing, New Iberia, La., Robert Eikel, Eikel & Davey, Houston, Tex., for plaintiff.

Thomas W. Thorne, Jr., Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans, La., for defendant.

## MEMORANDUM OPINION

W. EUGENE DAVIS, District Judge.

This admiralty action was brought by Dow Chemical Company (Dow) against Gulf Mississippi Marine Corporation (Gulf Miss), the owner of the Tug M/V GULF SEAS, for the loss of plaintiff's tank barge DC–715 and cargo.

The Barge DC–715 was a chemical tank barge owned by Dow Chemical Company and designed and certificated to transport liquid caustic soda. The barge was 260 feet long, 60 feet wide and 23 feet deep.

The DC–715 was constructed by American Marine Corporation during 1970. The ballast pumping system was added in the latter part of 1971. The barge sustained damage to her port bow in a collision in April or May, 1973, and the damage was repaired at Avondale Shipyards. A permanent Coast Guard certificate was obtained

on June 15, 1973, following completion of the repairs.

The M/V GULF SEAS was a seagoing tug owned by Gulf Miss.

Dow engaged Gulf Miss to tow its Barge DC–715, loaded with caustic soda, from the Dow plant in Freeport, Texas, to the Dow terminal in Savannah, Georgia.

Prior to this voyage, the GULF SEAS had undertaken the tow of the DC–715 on two previous occasions. Immediately prior to the voyage in question, the GULF SEAS had returned the barge to Freeport from Savannah.

Captain Ernest Adams was master of the GULF SEAS during the previous voyages on which the DC–715 was towed by that vessel and was familiar with the cargo and ballast pumping system on the barge.

The cargo and ballast pumps were operated by a common hydraulic system. The hydraulic power takeoff was powered by a single diesel engine. Depending upon which valves were manipulated, either cargo or ballast could be discharged.

When Captain Adams first took the Barge DC–715 in tow, the ballast and cargo pumping system was explained to him in detail by Mr. Gani Browsh, a Dow employee. The operation of the pumps was somewhat unusual and required orientation and instruction because of the placement and number of valves necessary to manipulate to accomplish either cargo discharge or deballasting.

On July 26, 1973, at 11:30 p. m., the M/V GULF SEAS docked the Barge DC–715 in ballast at Dow's loading dock in Freeport, Texas. A crew change of the GULF SEAS was effected approximately one hour later and Captain Adams went off duty at that time. The relief captain, Captain Phil Migues, came aboard shortly after the GULF SEAS docked. Captain Migues and Dow's representative, Gani Browsh, boarded the barge at approximately the same time, around midnight, and met briefly with Captain Adams, who was attempting to start deballasting. Since Captain Adams' departure from the vessel was imminent, Captain Migues had very little conversation with Browsh or Adams relative to the operation of the ballast system. Captain Migues had never operated the GULF SEAS previously and he was primarily interested in boarding the tug with Captain Adams and reviewing the tug's equipment.

Both Captain Adams and Captain Migues expected that a licensed tankerman would join the ship's crew prior to departure and it was Captain Migues' impression that it would be unnecessary for him to have a detailed working knowledge of the ballast and cargo pumping system.

Under the arrangement which existed between Dow and Gulf Miss, Gulf Miss was to provide, in addition to the regular crew aboard the GULF SEAS, a licensed tankerman to discharge cargo, take on ballast after discharge of cargo, and deballast the barge prior to loading.

The tankerman scheduled to join the crew did not arrive. Dow was advised by Gulf Miss that no tankerman would be aboard for this voyage and Dow assented to the voyage without a tankerman. Gulf Miss and Dow agreed that Captain Migues' license fulfilled the technical requirements for a tankerman.

At approximately 2:15 a. m. on July 27, the GULF SEAS left the Dow dock in Freeport to refuel at Galveston and did not return to the Dow dock in Freeport until 7:30 p. m. Prior to the departure of the GULF SEAS to Galveston, Mr. Browsh warned Captain Migues about the injurious capability of the liquid caustic soda cargo should it get in the eye of a crewmember or come in contact with his skin.

When Captain Migues returned to the DC–715 after refueling, the barge had been deballasted and loaded. Captain Migues learned for the first time that he would not have a tankerman aboard for this voyage. Captain Migues attempted to locate Mr. Browsh to determine if there were any specific towing instructions regarding the barge and Browsh told him that the barge was ready to sail and no special instructions were called for. Browsh did give Migues

general instructions relative to cargo pumping procedures. No specific instructions were given by Browsh relative to deballasting procedures and no specific questions were asked by Captain Migues, although both men were aware that the GULF SEAS would be sailing without a licensed tankerman.

On prior voyages, the GULF SEAS crew had difficulty opening and closing the valves on the DC–715 which controlled discharge of both cargo and ballast. This problem had been experienced on June 28 and 29 and was reported to Dow. Dow personnel attempted to grease and free the valves in Plaquemine on July 9. Captain Adams noted in the log further difficulty with respect to the cargo valves following this repair and maintenance performed by the Dow crew. In fact, Captain Adams was unable to deballast the barge when she docked in Freeport on July 26 until Mr. Browsh freed and opened the valves. The deballasting was then completed by three Dow employees, two of whom were experienced tankermen. Although the Dow personnel testified that they tightly closed all of the valves to the void spaces, the sea chest and sea suction, it is apparent that either because of the complex nature of the valve arrangement or because of the malfunction of the valves, the Dow personnel did not securely close these valves.

Prior to departure, Captain Migues made a thorough walking inspection of the Barge DC–715. The barge appeared to Captain Migues to be in good order for sea except for a loose manhole cover which was secured.

The GULF SEAS departed the Dow dock with the DC–715 in tow at 10:30 p. m. on July 27.

Once the two cleared the Freeport Channel sea buoy, the GULF SEAS placed the barge on an 1,800 foot towline. The weather and sea conditions from the time of departure until the sinking were ideal for towing. There is no evidence whatever that the barge grounded or came into collision with any object prior to the sinking.

The voyage was uneventful until July 31 at 6:00 p. m. when Captain Migues assumed his six-hour watch. At that time, he followed his routine practice of inspecting the tow through binoculars. His observation of the tow indicated to him that the barge continued to ride on an even keel. When he observed the barge through binoculars approximately one hour later, he noted that there was an increase of freeboard on the barge's starboard bow and that the barge, instead of riding directly behind the tug, was following slightly to port of the tug. Captain Migues stopped his headway and allowed the barge to come alongside the tug. He noted at this time that the barge was down on her port stern and that the ground swell was washing over a small portion of the port stern deck.

Captain Migues then maneuvered his tug in position to secure her to the barge's port bow. He and several crewmembers boarded the barge for a closer inspection. Although Captain Migues did not feel that the barge was in immediate danger of sinking, he considered that the barge was in serious trouble.

Captain Migues consulted the vessel's charts and ascertained that the nearest port of refuge, Key West, Florida, was 30 to 36 hours running time away.

Since the access points to the port stern ballast tanks were under water, the tug crew was unable to use the tug's portable pump to lighten these tanks. Captain Migues made the decision to use the barge's ballast pump to partially deballast the port stern ballast tanks.

At approximately 7:30 p. m., Captain Migues, the mate, engineer and a deckhand attempted to start the barge's ballast pump and pump water from the port stern ballast tanks.

The engineer was successful in starting the diesel engine and was able to engage the hydraulic pumps. The engineer opened the ballast pump to the sea chest valve to prime the ballast pump. Captain Migues then opened the main suction valve and uncovered the flange on the starboard stern overdeck discharge line and determined

with a flashlight that the discharge line was open. When the hydraulic pressure built up, the deckhand was stationed beside the hydraulic motor connected to the ballast pump on the port stern of the barge. A valve was located in the hydraulic line running from the hydraulic pumps to the hydraulic motor. The tug crew opened this valve and were able to get hydraulic fluid to the cargo pumps but were unable to get hydraulic fluid to the ballast pumps. The crew attempted to trace the hydraulic line but missed the valve which, if opened, would have allowed hydraulic fluid to flow to the ballast pump.

Captain Migues knew at this time that he could discharge cargo and considered taking this action to lighten the port stern of the barge. Because of the warnings given to him by Dow as to the dangerous nature of the cargo, Captain Migues elected not to discharge cargo because of his concern that a member of his crew might be blinded by the caustic soda solution should it get in his eye.

After making the decision not to jettison cargo at sea, Captain Migues closed all valves which he had opened and put his tug and tow on a course for Key West, Florida. He unsuccessfully made efforts to contact his office and the U. S. Coast Guard, both on his single sideband radio and on his ship-to-shore radio.

From the time the tow was resumed, at 9:00 p. m., the DC–715 was under constant surveillance by the tug's crew. At 10:30 p. m. Captain Migues observed an increase in the freeboard on the barge's starboard bow and he maneuvered the GULF SEAS alongside the barge. He again boarded the barge and saw that the barge had taken on more water and was in imminent danger of sinking. At 11:00 p. m. the GULF SEAS disconnected her towline and stood by some 100 yards away. At 11:40 p. m. the barge suddenly rolled over on her port side, keel up and sank, stern first in approximately 1,800 fathoms of water.

Around this time, Captain Migues was able to make radio contact with the Tug

PEARL BOLLINGER and request that that vessel contact the Gulf Miss office.

The Tug GULF SEAS departed the area for her home base at noon on August 2.

Neither the barge nor her cargo was recovered.

There is no evidence to support defendant's contention that the hull of the barge ruptured. The weather was ideal for towing and there is no evidence that the barge came into collision with any object. I find that the only reasonable explanation for the barge taking on water was the failure of the Dow loading personnel to securely close the openings to the void spaces, the sea chest and sea suction. The likelihood of this having occurred is enhanced by the history of corrosion or other mechanical malfunction in the valve controls making their operation difficult.

■ The barge, by virtue of her unsecured openings to the ballast system and sea chest, was unseaworthy at the commencement of the voyage. Dow therefore violated its obligation to furnish a seaworthy tow. *South, Inc. v. Moran Towing and Transportation Co.*, 360 F.2d 1002 (2nd Cir. 1966); *Stall & McDermott v. The Southern Cross*, 95 F.Supp. 612 (E.D.La.1951), *affirmed*, 196 F.2d 309 (5th Cir. 1952).

■ The Dow tankermen who completed the deballasting testified that they used a cheater pipe for leverage on the valve handles to assure that the valve handles were in a closed position. Despite the fact that the valve handles indicated that the closures were secure, it is apparent that they were partially open. Absent a minute, detailed inspection, the openings in the ballast system could not have been discovered by the tug crew. In view of the assurances made prior to the voyage by the Dow personnel to Captain Migues, I find that an inspection by the tug crew of the barge to this extent was not required. The walking inspection of the barge made by Captain Migues was adequate and reasonable under the circumstances. A detailed inspection of an apparently seaworthy barge is not required. *New Orleans Coal & Bisso Tow-*

boat Co. v. United States, 86 F.2d 53 (5th Cir. 1936); Nat G. Harrison Overseas Corp. v. American Tug Titan, 516 F.2d 89 (5th Cir. 1975); Otto Candies, Inc. v. Great American Insurance Company, 221 F.Supp. 1014 (E.D.La.1963), affirmed, 332 F.2d 372 (5th Cir. 1964).

■ Additionally, I find that Dow was at fault in failing to furnish a diagram or drawing of the ballast pumping system to Captain Migues or to give him detailed instructions as to the procedure to be followed in deballasting the barge. This finding is made for several reasons. The ballast pumping system was complex; Dow knew that an experienced tankerman would not join the tug crew; and Dow knew that Captain Migues was unfamiliar with the ballast pumping equipment.

I also conclude that the M/V GULF SEAS and her owner, Gulf Miss, were at fault.

■ The M/V GULF SEAS had an inadequate crew and was rendered unseaworthy because she had no one on her crew qualified to operate the ballast pumping equipment on the barge. A tug crew is obliged to become familiar with and competent to operate the equipment aboard its tow. Chesapeake Bay Bridge & Tun. Dist. v. Oil Screw Prince, 298 F.Supp. 881 (E.D. Va.1968); In re Pacific Mail S. S. Co., 130 F. 76 (9th Cir. 1904). This is particularly true of the ballast pumping system. A barge can take on water during an ocean voyage for a variety of reasons, any one of which could require deballasting. Captain Migues thus committed grave error in undertaking this tow without first familiarizing himself with the ballast pumping equipment.

Gulf Miss claims that the barge was overloaded and that the density of the cargo did not comport with her certificate. Based upon the testimony of Captain Migues, the barge was not overloaded. Even if the barge were overloaded to the slight degree claimed by defendant, I find that such overloading did not cause or contribute to the sinking.

Plaintiff strongly urges that Captain Migues should have jettisoned cargo at approximately 7:30 p. m. on July 31 when he boarded the barge after noting that she was down by the port stern. Captain Migues admitted that he could have discharged cargo at that time. He had been warned, however, of the danger inherent in handling this cargo. Captain Migues was concerned that the discharge of cargo at sea would result in injury to his crew. He was particularly afraid that one of his crewmembers could be blinded if the liquid caustic soda should be picked up by the wind and carried into the eyes of a crew member.

■ The captain has the authority to jettison cargo where such action is necessary to save the vessel. Lawrence v. Minturn, 17 Howard 100, 58 U.S. 58, 15 L.Ed. 58 (1855); Ralli v. Troop, 157 U.S. 386, 15 S.Ct. 657, 39 L.Ed. 742 (1895), and The Roanoke, 59 F. 161 (7th Cir. 1893). The captain's concern for his crew, however, was properly paramount, and under these circumstances the captain's decision that he would not discharge cargo at sea was not unreasonable. Captain Migues had no assurance, for example, that the wind direction or velocity would not change during the time required to discharge cargo. Captain Migues' decision must be considered as one made in extremis, and must be examined in the context in which it was made. See Central Railroad Co. of New Jersey v. Tug Marie J. Turecamo, 238 F.Supp. 145, 148 (E.D.N.Y. 1965); M. P. Howlett, Inc. v. Tug Michael Moran, 425 F.2d 619, 622 (2nd Cir. 1970); Tidewater Construction Corp. v. Southern Materials Co., 269 F.Supp. 1000, 1005 (E.D. Va.1967) and cases cited therein.

Plaintiff urged in its brief that the list in the barge would have been discovered prior to 7:00 p. m. on July 31 had the tug maintained a proper lookout over its tow. However, in the suggested findings and conclusions submitted by plaintiff no such fault on the part of defendant is suggested.

The tug had the barge on an 1,800 foot towline. No evidence was submitted that this towing procedure was improper. The barge was riding low in the water with

approximately three and one-half feet of freeboard on the bow.

 No evidence was produced to show when, prior to the evening of July 31, the crew should have observed the increase of freeboard on the bow. Likewise, no evidence was adduced tending to show that the tug crew, as a good towing practice, should have boarded the tow at periodic intervals for a closer inspection so that the list could have been discovered earlier. Absent such evidence, I find no fault on the part of the GULF SEAS in this respect.

Dow also urged in its brief that the tug was at fault in failing to make radio contact with its company office to obtain instructions after the barge was in peril. No evidence was produced which would tend to show that the radio equipment aboard the tug was defective or inadequate or that the tug should have been able to contact its office with the available radio equipment.

Around the time of the sinking, the tug did make radio contact with the Tug PEARL BOLLINGER, which indicates that there was no mechanical malfunction in the vessel's radio. The only evidence in the record as to why the tug was unable to make contact with its office was the testimony of Captain Migues that atmospheric conditions apparently reduced the range of his radio equipment.

I find therefore that the evidence does not support a finding of fault on the part of the GULF SEAS in this respect.

The Supreme Court case of *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), requires an apportionment of the fault between the respective vessels in this case.

In capsule form, Dow was at fault in furnishing an unseaworthy barge at the commencement of the voyage and in failing to acquaint Captain Migues with the somewhat complex ballast pumping system when Dow knew the tug's crew was unfamiliar with this equipment.

The GULF SEAS, on the other hand, was at fault in failing to provide an adequate crew, competent to operate the equipment provided on the barge for deballasting.

 In weighing the respective fault of the two parties, I am unable to say that the fault of either party was more or less grave than the other. I therefore conclude that the accident was caused equally through the fault of plaintiff and defendant.